SCHLAM STONE & DOLAN LLP
Jeffrey M. Eilender
Paul Stretton
26 Broadway
New York, New York 10004
Tel.: (212) 344-5400
Fax: (212) 344-7677
E-Mail: jeilender@schlamstone.com
E-Mail: pstretton@schlamstone.com

*Attorneys for Yifat V. Schnur and*
*Yifat V. Schnur LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ——————————————————— x | |
| In re: : | Case No. 1:24-bk-11422 |
| : | |
| JOHN G. BALESTRIERE, : | Adversary No ____ |
| : | |
| Debtor. : | Chapter 7 |
| : | |
| : | |
| : | **COMPLAINT TO DETERMINE** |
| : | **DISCHARGEABILITY OF DEBT** |
| : | |
| ——————————————————— x | |
| YIFAT V. SCHNUR and YIFAT V. : | |
| SCHNUR, ESQ., LLC : | |
| *Plaintiffs*, : | |
| : | |
| -against- : | |
| : | **DEMAND FOR JURY TRIAL** |
| JOHN BALESTRIERE, : | |
| , : | |
| *Defendants*. : | |
| --------------------------------------------------- x | |

Pursuant to 11 U.S.C. § 523(a)(4), (6), plaintiff Yifat V. Schnur ("Plaintiff" or "Schnur")

and Yifat V. Schnur LLC (Corporate Plaintiff, together with Schnur, "Plaintiffs") for their

Complaint to Determine Dischargeability of Debt allege and state as follows:

## PRELIMINARY STATEMENT

1        This is an adversary proceeding brought pursuant to Federal Rule of Bankruptcy Procedure 7001(6) and 11 U.S.C. § 523(a)(4), (6) to determine the dischargeability of a debt arising from tort claims pending against Defendant Balestriere in New York County Supreme Court (the "State Court"), in an action captioned as *Schnur, et al. v. Balestriere, et al.*, Index No. 160095/2018 (the "State Lawsuit") and based upon willful and malicious injuries that Defendant Balestriere caused to Plaintiff and upon Defendant Balestriere's fraud while acting in a fiduciary capacity.

2        In the State Lawsuit, Plaintiff seek redress for the emotional, reputational, professional and permanent economic injury she has suffered as a result of an intentional and malicious scheme concocted by Defendant John Balestriere in connivance with certain non-parties in order to destroy Plaintiff.  The center of the "RICO" scheme was to file and publicize false allegations against Plaintiff in a federal lawsuit falsely accusing Plaintiff of managing and participating in a heinous alleged enterprise that allegedly beat, raped and sexually tortured at least seven women[1].  Defendant Balestriere had no basis to make these shocking and terrible allegations. United States District Judge Brian M. Cogan has already ruled not just that the claims against Plaintiff had to be dismissed, but expressly that there was no good faith factual or legal basis for Defendant Balestriere to bring these devastating allegations in the first place. Despite the imposition of $20,000 in Rule 11 sanctions against Defendant Balestriere and his

---

[1] The Federal Lawsuit was filed by Defendant Balestriere on behalf of the three Original EDNY Plaintiffs on November 2, 2017. The RICO allegations were dismissed early on in the case. And the remaining tort and trafficking claims were tried by a jury in March of 2022. The jury threw out all of EDNY Plaintiffs' tort claims, except for one tort as to a single EDNY Plaintiff and found liability on the trafficking claim– which was appealed on the basis of an improper instruction.

firm, Plaintiff's reputation is irredeemably ruined, and she still suffers and will continue to suffer from these malicious, false allegations indefinitely. Fulfilling exactly what Defendant Balestriere intended.

3       Plaintiff Yifat V. Schnur is an Observant Orthodox Jew, mother of four young children and a former assistant district attorney. On November 1, 2017, she was a fully engaged member of her tight-knit religious community, involved in her children's school, and building her private law practice. She had been approached by a sitting town councilman who invited her to run for town office.

4       Beginning in the wee hours of November 3, 2017, the New York Post published a slew of articles, four publications in less than 24 hours, blasting allegations that would destroy Plaintiff's life. Plaintiff Schnur read with growing horror the following headline in the New York Post: *Former Prosecutor Accused of Covering Up Portfolio Manager's Sex Dungeon*. A true and complete copies of the four NY Post articles are annexed hereto as Exhibit 1. The article just mentioned, which named Plaintiff as the "former prosecutor" was based on a scandalizing and salacious lawsuit filed by Defendant Balestriere. The action is *Lawson v. Rubin*, 1:17-cv06404 (E.D.N.Y.) (the "Sham Action").

5       As the Post article related, and as set out more fully below, the Sham Action alleged that Plaintiff managed and was engaged in a criminal racketeering enterprise that engaged in sex trafficking, luring women to New York where they were bound, beaten and raped. According to the Sham Action, Howard Rubin, a wealthy and well-known public figure in the financial world, invited models to New York for BDSM encounters. Rubin would have dinner with them, and bring them back to his apartment. In the apartment there was a "dungeon" room, in which, according to the Sham Action, Rubin would bind, beat and rape the women.

The Sham Action reads like a gruesome and twisted BDSM pornographic novel. The Sham Action alleges that Rubin bound and gagged the women, penetrating them himself and with objects, including an electrified cattle prod and a pool cue. During these encounters it is alleged that Rubin said "I'm going to rape you like I rape my daughter."

6       The Sham Action accused Plaintiff– a lawyer and former assistant district attorney – of series of federal felonies including racketeering, sex trafficking, witness intimidation and obstruction of justice.

7       The NY Post articles were only the tip of the iceberg. As set forth below, there were over a dozen articles in print, innumerable on the Internet and even television coverage on FOX News and talk radio of the allegations of the Sham Action and the role of "fixer" and lawyer (Plaintiff). The coverage was world-wide. Articles were published, among other places, in Russia, France and the U.K., as well as in the U.S.

8       From November 3 through November 10th, 2017, Plaintiff was bombarded with calls and emails from at least a dozen news outlets.

9       The effect is exactly as Defendant Balestriere intended; these allegations have made Plaintiff a pariah. Clients have dropped her, she is shunned by many in her community, no longer invited to participate in school activities and her political aspirations have been destroyed. Plaintiff has even received threats on her life.

10      Plaintiff's relationship with her husband has suffered, and her children have been shunned socially.

11      Perhaps the most shocking fact in the entire affair is that Defendant Balestriere brought these life shattering allegations knowing that they were utterly baseless. Defendant Balestriere alleged that Plaintiff drafted non-disclosure agreements ("NDAs") barring the victims

of the scheme from disclosing what happened to them to law enforcement and others. Defendant Balestriere alleged that other members of the supposed criminal ring presented them to each victim prior to the rapes and beatings. Allegedly, Plaintiff thereafter threatened and intimidated the victims into silence, invoking these NDAs.

12    Before Defendant Balestriere commenced the Sham Action, he knew these allegations were false. Not only did Plaintiff tell Defendant Balestriere that his accusations were entirely false and without merit. Plaintiff warned him of the possibility of Rule 11 Sanctions if he included Plaintiff in the Sham Action, and, as Judge Cogan mentioned in his opinion awarding Rule 11 sanctions, Plaintiff even provided Defendant Balestriere with case law that undisputably showed that Defendant Balestriere's claims against Plaintiff had no basis in law.

13    But discovery in the Sham Action -- in particular the EDNY Plaintiffs[2]' own sworn discovery responses and deposition testimony -- quickly established that: (a) Plaintiff did not draft the NDAs[3]; (b) each of EDNY Plaintiffs signed the NDAs and had most or all of their encounters with Rubin before Plaintiff herself ever met Rubin; and (c) far from threatening the EDNY Plaintiffs, Plaintiff had never met, spoken or communicated with any of them.  Indeed, in their depositions, the EDNY Plaintiffs cannot even articulate a basis for why they asserted the claims in the Sham Action against Plaintiff.  **Most of the EDNY Plaintiffs did not even know**

---

[2] The "Original EDNY Plaintiffs" are Amy Moore a/k/a *Hillary Lawson*, Mia Lytell a/k/a *Kristina Hallman*, Katrina Rico a/k/a *Stephanie Caldwell*. The "Amended EDNY Plaintiffs" are Natasha Tagai a/k/a *Moira Hathaway*, Emma Hopper a/k/a *Macey Speight*, Brittany Hassen a/k/a *Rosemarie Peterson* and Brittany Reyes a/k/a *Lauren Fuller*. Pseudonym (marked with italics in this footnote) were used the EDNY Plaintiffs early in the Sham Action until Judge Cogan required the EDNY Plaintiffs to use their real names.

[3] Even had Plaintiff drafted NDA's, such agreements are legal and lawful.

**who Plaintiff was or why she had been sued.  Some of the EDNY Plaintiffs did not even know that they had sued Plaintiff.**

14      After most of a year of litigation and discovery in the Sham Action, Judge Cogan, who presides over the Sham Action, imposed $20,000 in sanctions under Federal Rule of Civil Procedure 11 against Balestriere and Balestriere Fariello, on the grounds that they knew all along that there was never any factual or legal basis for the claims against Plaintiff.

15      Plaintiff filed the State Lawsuit on October 31, 2018, and it has been pending for more than six years due to the dilatory litigation tactics and multiple misrepresentations of Defendant Balestriere and his co-counsel Saland. Plaintiffs' claims for defamation, malicious prosecution and violation of Judicial Law Section 487 (a statute that provides a case of action for fraud on the court) have survived a motion to dismiss and were moving toward summary judgment and trial when Defendant Balestriere filed a petition for Chapter 7 bankruptcy. An action that he no doubt planned strategically to evade liability to Plaintiff.

16      Through this adversary proceeding, Plaintiffs seeks a determination from this Court that the tort claims against Defendant Balestriere are not dischargeable through this bankruptcy because, as shown below, the debts arising from the tort claims are for (i) willful and malicious injury by Defendant Balestriere to Plaintiffs and (ii) Defendant Balestriere's fraud while acting in a fiduciary capacity to EDNY Plaintiffs as their attorney.

**JURISDICTION AND VENUE**

17      Defendant Balestriere filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on August 16, 2024, initiating the case sub judice.

18      This Court has jurisdiction pursuant to 11 U.S.C. § 1334(b).

19      This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

20      Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

## PARTIES

21      Plaintiff Yifat V. Schnur is a practicing attorney, admitted in New York and New Jersey in both the state and District Courts. Plaintiff is also admitted in the Eastern District of Michigan.

22      Plaintiff Yifat V. Schnur LLC is the law firm of Plaintiff Yifat Schnur.

23      Defendant Balestriere is an attorney with multiple grievances filed against him with the grievance committee.[4]  He practices through the firm Balestriere Fariello, located at 225 Broadway, New York, and New York.

24      Defendant Balestriere is lead counsel in the Sham Action.  He signed the complaint, RICO statement, amended complaint, amended RICO statement and second amended complaint.  Upon information and belief, through interviews with his clients, review of documents they possessed, review of deposition testimony and the preparation and review of discovery responses by his clients, he has known from before the Sham Action was filed that there was no factual or legal basis for the claims against Plaintiff.

## RELEVANT NON-PARTIES

25      Non-Parties Original EDNY Plaintiffs Moore, Lytell and Rico were the original plaintiffs in the Sham Action.

26      Non-Parties Amended EDNY Plaintiffs Tagai, Hopper, Hassen and Reyes became plaintiffs in the Sham Action in the amended complaint.

27      Non-Party Saland is a lawyer who represented Original EDNY Plaintiff Mia Lytell in a criminal case.  In that case, Lytell was charged with assaulting non-party Zoe

---

[4] A true and complete copy of a grievance complaint filed by Plaintiff against Defendant Balestriere, dated May 7, 2021, is annexed hereto as Exhibit 17.

Cacciola in an apartment rented by Rubin, when Rubin was not present. Saland introduced the Original EDNY Plaintiffs to Balestriere. While Saland did not make a formal appearance in the Sham Action, discovery in this action has showed that Saland served as and represented himself as Balestriere's co-counsel in the Sham Action, represented the EDNY Plaintiffs, and actively drafted a number of the false allegations made against Schnur in the complaint in the Sham Action. Saland later publicly slandered Plaintiff in the media, in a concerted effort to support the Sham Action. Saland's firm, Non-Party Crotty Saland P.C., is vicariously liable for his torts.

28      Non-Party Howard Rubin is a former trader and portfolio manager. He is well-known in the financial community for among other things, having appeared in the books *Liars Poker* and *The Big Short*. As noted above, the Sham Action falsely accused Rubin of a series of depraved acts of rape and torture of women in an apartment he rented.

29      Non-Party Jennifer Powers is Rubin's assistant. She was named as a defendant in the Sham Action. According to the allegations of the Sham Action, Powers located and persuaded the EDNY Plaintiffs to meet with Rubin. She is alleged to have coordinated the travel and logistical arrangements for these meetings. Powers was found not liable on all accounts.

## Background

30      Plaintiff first represented Rubin in connection with a legal matter unrelated to any litigation and then in October 2016 in relation to a settlement agreement. The agreement was a release in exchange for money between Rubin and Katrina Rico. Katrina Rico eventually become one of the EDNY Plaintiffs. This sequence begins with two events that placed Plaintiff in the cross hairs of a vicious conspiracy.

31      **The first event** was Original EDNY Plaintiff Mia Lytell's arrest for assault and Lytell's subsequent search for and retention of Jeremy Saland (who is also a defendant in the State Lawsuit).

32      Original EDNY Plaintiff Katrina Rico was friends with Original EDNY Plaintiff Mia Lytell. Both Katrina Rico and Lytell had engaged in consensual "BDSM" encounters with Rubin. On October 20, 2016, Lytell was staying at Rubin's apartment. At a time when Rubin was not present, Lytell became engaged in a physical altercation with another woman who was there, Zoe Cacciola. Cacciola called the police because Lytell punched her in the face and Lytell was arrested and charged with assault for breaking Cacciola's nose.

33      Lytell, on her own, searched for and located a criminal defense attorney, Jeremy Saland. Lytell then retained Saland to represent her in the criminal case. Lytell needed $3,500 to retain him. Lytell ultimately prevailed upon Rubin to pay Saland's flat fee.

34      Lytell was criminally charged by the Manhattan District Attorney's office with a misdemeanor assault. Upon information and belief, Cacciola did not cooperate in the prosecution and the People offered on more than one occasion to resolve the matter were Lytell to plead to a violation – a non-criminal disposition.

35      Upon information and belief, Saland continuously advised Lytell not to take such a plea. Rather, Saland informed Lytell repeatedly that Saland would have the case dismissed. Thus, over the coming year, the case continued to pend, with Lytell repeatedly coming to New York for court appearances. Rubin did not see Lytell on any of these occasions when she travelled to New York to make her criminal court appearances.

36      By August 2017, Lytell was frustrated with Saland and confused and anxious as to why the criminal case was not resolved. Lytell repeatedly shared her lack of confidence in Saland with Jennifer Powers, in numerous WhatsApp text messages.

37      Powers, in an attempt to help the frantic Lytell, whom Powers considered a friend, raised the idea to Lytell to have Plaintiff speak to Saland, so that Plaintiff might then explain the posture of the case to Lytell -- something that Saland was either unwilling or incapable of doing.

38      While Plaintiff was not adverse in any sense to Lytell, and there was no litigation or threatened litigation against Plaintiff or Rubin at this time, out of an abundance of caution Plaintiff declined to communicate directly with Lytell about the matter, but would only communicate with Lytell's counsel, Saland.

39      On August 16, 2017, Saland, having received permission from Lytell to discuss Lytell's criminal matter with Plaintiff, initiated a phone call to Plaintiff. The two discussed the status of Lytell's case.[5]  Saland then suggested that he meet with Plaintiff in Manhattan, saying he first had to pick up his dry cleaning from Midtown, but then did not return Plaintiff's calls and did not show up.

40      At no point did Plaintiff communicate with Lytell in any manner whatsoever.

41      **The second event** was Lytell's involvement with Robert Aloi.

42      At some point between October 2016 and August 2017, Lytell became romantically involved with Aloi.  Lytell (and Katrina. Rico, her long-time friend) lived in an apartment Aloi leased.  Lytell drove a white Mercedes Aloi had provided.

43      Upon information and belief, Lytell forged a scheme with Aloi to blackmail Rubin.  Upon information and belief, before August 2017, Lytell shared details with Aloi of Lytell's BDSM encounters with Rubin. Lytell also revealed to Aloi details of Rubin's private life

---

[5] Technically, there were two phone calls.  Saland initiated a call to Plaintiff, but after a few minutes, Plaintiff had to hang up.  Plaintiff returned the call shortly thereafter, and the two continued their conversation.

and Rubin's BDSM encounters with other women. Lytell and Aloi planned to threaten to reveal Rubin's various BDSM encounters to the public, to Rubin's wife, and to Rubin's children, if Rubin did not pay up.

44      In furtherance of this scheme, on August 11, 2017, Aloi reached out to a charity of which Rubin was a board member, seeking to get in contact with Rubin urgently. The next day, August 12, 2017, according to Lytell's phone records obtained in discovery in the Sham Action, Aloi had a forty-minute phone call with Lytell. Upon information and belief, this call concerned the blackmail scheme.

45      Also, on August 11, 2017, foreshadowing the reason Aloi reached out to Rubin, Aloi posted photos of Rubin on Instagram and Snapchat, with a direction for women who had been involved with Rubin to contact Aloi.

46      Later that day, August 11, 2017, at Rubin's request, Plaintiff responded to Aloi's email. Plaintiff agreed to speak with Aloi a few days later. On August 14, 2017, during the first phone call between Plaintiff and Aloi, Aloi stated that he knew that Rubin had been involved in BDSM encounters with Katrina Rico and other women. Aloi hinted that he would go public with this damaging information unless a substantial payment could be structured to Aloi and unnamed others.

47      On August 14, 2017, Plaintiff reached out to the prosecutor's office in Middlesex County, where Plaintiff resides. In order to facilitate their prosecution of Aloi for his extortionate threat against Rubin, law enforcement enlisted Plaintiff's assistance. Over the next two weeks, with law enforcement surreptitiously listening in, Plaintiff participated in a number of "controlled" calls with Aloi. Ultimately, on August 23, 2017, Aloi demanded in a written communication to Plaintiff $9.95 million from Rubin, otherwise Aloi would go public with the

salacious allegations against Rubin. Significantly, Aloi provided Plaintiff with the personal cellphone number of New York Post reporter Rebecca Rosenberg. Aloi told Plaintiff that Aloi had already shared sufficient details with Rosenberg to pique her interest. However, Aloi said, if Plaintiff would agree to pay Aloi, Aloi would not communicate further with Rosenberg. At the direction of law enforcement, Plaintiff agreed to a meeting with Aloi. The meeting was set for September 18, 2017, at a "fake" office, where the office staff were actually all law enforcement officers. Aloi, no doubt sensing he was about to be arrested, never appeared, and eventually left the country for an extended period.

48      Aloi was served with a criminal complaint by the Detective Division of the Middlesex County Prosecutor's office and the Maryland Police Department, in Maryland, on October 11, 2017. Aloi was indicted for this extortion scheme in February 2018 and was subsequently incarcerated after sentencing on March 6, 2020.

49      Upon information and belief, these events converged as follows: As Aloi launched his attempt to extort Rubin, the relationship between Aloi and Lytell began to deteriorate. Lytell perhaps fearful that Aloi had sufficient information to implicate her, confided with Saland.

50      Upon information and belief, Lytell shared her concerns over Aloi and the extortion scheme with her lawyer, Saland.

51      Saland assured Lytell that he was experienced in handling harassment and extortion matters. Upon information and belief, at this same time, Saland decided not to let a profitable idea go to waste. While Aloi's ham-fisted scheme to profit from Lytell and Katrina Rico's encounters with Rubin was not progressing, Saland saw a different possibility.

52      Saland knew a lawyer who could wring a profit from these facts, Defendant Balestriere. Saland knew Balestriere from their days as assistant district attorneys. Saland and Defendant Balestriere had also previously represented clients in civil/criminal matters, with Saland handling the criminal matter and Defendant Balestriere taking on the civil representation. Upon information and belief, Saland steered the Original EDNY Plaintiffs to Defendant Balestriere.

53      Joined by Original EDNY Plaintiff Moore, another woman who had had alleged BDSM encounters with Rubin, Lytell and Katrina Rico connected with lawyer Defendant Balestriere. As soon as Aloi's clumsy extortion attempt appeared to be failing, Defendant Balestriere and the Original EDNY Plaintiffs moved to a more sophisticated strategy. They would write out revolting allegations about Rubin in a purported "complaint," and threaten to file the complaint unless Rubin paid them a "settlement."

54      The flaw in this plan, as Defendant Balestriere and the Original EDNY Plaintiffs soon intuited was Plaintiff. Plaintiff had tenaciously protected her client Rubin from Aloi's extortion attempt. As the weeks went by, Aloi got nowhere with his (and Lytell's) plan. Indeed, at this time Plaintiff had gone so far as to participate in the undercover plan to arrest Aloi. Defendant Balestriere and the Original EDNY Plaintiffs knew that in order to intimidate a settlement out of Rubin, they would have to go through Plaintiff.

55      The most effective way to neutralize Plaintiff would be to make her a "defendant" in the purported lawsuit. Not just make her a defendant, but allege Plaintiff's participation in a revolting criminal sex trafficking racket; allege that she intimidated rape victims and obstructed justice. Faced with these types of life destroying allegations, Plaintiff (who unlike Rubin is not a wealthy former financier), would become an ally in attempting to get Rubin to pay rather than

13

have the "suit" filed and made public, with its devastating and irreparable consequences for Plaintiff.

56      The problem with this scheme was that there was absolutely no factual basis for any such claim. The Original EDNY Plaintiffs had no facts to support claims against Plaintiff, at all. Indeed, none had ever spoken to, met or communicated with her in any manner. They had no information about what work, if any Plaintiff had ever done for Rubin. They did not even know the date when Plaintiff first represented Rubin.

57      With no basis for claims against Plaintiff whatsoever, Defendant Balestriere and the Original EDNY Plaintiffs concocted false allegations out of whole cloth. Each and every allegation made against Plaintiff was completely fabricated, fictional and false.

58      These were not "off the rack" allegations. Defendants specially tailored them to cause maximum terror and, once filed, maximum harm to Plaintiff. Plaintiff is a lawyer and former assistant district attorney, part of a law enforcement community. Therefore, Defendant Balestriere alleged that she was now a criminal, and a criminal in an almost unimaginably vile series of crimes. Plaintiff is an Orthodox Jew and lives in a tight-knit religious community. Her husband was raised as a Hasidic Jew. Defendant Balestriere smeared her with false grotesque sexual torture allegations knowing that these would be even more viscerally repellant to those in a conservative religious society.

59      Defendants knew that the publication and republication of the Sham Action's allegations would ruin Plaintiff's business, emotional health and personal and social relationships.

## Defendants Attempt to "Break" Plaintiff

60      After an intensive and wrenching month-long struggle to bring extortionist Robert Aloi to justice, Plaintiff was flabbergasted by the contents of an email she received from attorney

14

Defendant Balestriere on September 19, 2017. That day, Balestriere called Plaintiff after 6 p.m. from a blocked number to ascertain if Plaintiff represented Rubin. Balestriere followed up with Plaintiff by sending a draft complaint with the words "Confidential for Settlement Purposes Only" across the top of each of the fifty-three pages. Balestriere requested to speak with Plaintiff at noon the next day (September 20). Plaintiff was stunned by the appearance of a second party attempting to extort Rubin, this time under the guise of a legal claim. Just the day before, on September 18, 2017, Plaintiff had received an email from Aloi. Aloi ended that email stating "Legal will send you the formal agreement soon." While Plaintiff soon realized that Defendant Balestriere's communication did not reference Aloi, there is no coincidence that less than thirty-one hours after Aloi told Plaintiff she would hear from "legal", Plaintiff received Defendant Balestriere's call and draft complaint with its horrific allegations.

61     With Defendant Balestriere's appearance, Aloi dropped off the scene completely and Plaintiff never heard from Aloi again.

62     The draft complaint from Defendant Balestriere set out a frightening and sordid story of Rubin luring each of the Original EDNY Plaintiffs to a New York penthouse. There, the complaint went on, in a "dungeon" room, Rubin allegedly bound, beat and raped them. One had allegedly been beaten so badly her breast implant inverted. Another allegedly had been raped with a cattle prod. Rubin, after allegedly tying the women up, allegedly said he would beat and rape them, saying "I'm going to rape you like I rape my daughter," and the woman "is the baby. Howie is the daddy. The daddy has to beat his baby."

63     The draft complaint alleged that Plaintiff was part of a criminal racketeering enterprise, in violation of the Federal Racketeering Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1961 *et seq*., through acts of sex trafficking, assault, battery, witness

intimidation and obstruction of justice. It falsely alleged that Plaintiff acted to protect this vile

criminal operation through interfering with the victims and the use of non-disclosure agreements.

It also alleges that Plaintiff violated her "ethical obligations" by trying to take over the

representation of Lytell in the criminal case.

64      Having launched their assault on Plaintiff, Defendant Balestriere immediately

began pressuring Plaintiff.  Having just the night before seen a draft complaint that accused her

of federal felonies, including accessory to sex trafficking and rape, as delineated below, Plaintiff

was then bombarded by half a dozen threatening emails and calls from the Balestriere

Defendants in the space of less than twelve hours.

65      At 10:34 a.m., on September 20, 2017, Defendant Balestriere emailed Plaintiff to

speak, noting that "if we do not hear from you we intend to file the complaint."

66      About an hour later, at 11:40 a.m. on September 20, Plaintiff responded that she

was in court in the morning and then had to prepare for Rosh Hashanah, which was that evening,

followed by the Sabbath.  As such, Plaintiff would be out of electronic communication through

September 23, 2017.  Plaintiff is an observant Orthodox Jew.

67      Defendant Balestriere responded angrily just minutes later, at 11:49 a.m.: "Your

clients need to sign a tolling agreement by tomorrow at noon . . ." Adding, "Please do not lecture

me on how the holidays will interfere with this.  They won't.  My position is firm."

68      Just minutes after this, at 11:56 a.m., on September 20, 2017, Matthew Schmidt (a

partner at Defendant Balestriere's firm) continued the campaign of harassment emailing Plaintiff

a tolling agreement (copying Defendant Balestriere), saying "I will call you shortly."  Less than

five minutes later at approximately 11:59 a.m., Schmidt called and left Plaintiff a voice mail.

Immediately thereafter, at 12:00 p.m., Schmidt emailed again (copying Defendant Balestriere),

repeating the threat: "if your clients don't execute the tolling agreement by noon tomorrow, we cannot promise that we will not file the complaint." Notably the tolling agreement included a provision for Plaintiff personally to toll the "claims" against her.

69      Just after 6:30 p.m., the same day (September 20, 2017), Defendant Balestriere directed Lytell to create a group chat using WhatsApp with Rubin and Powers. Defendant Balestriere gave this direction knowing that (a) Plaintiff was representing Rubin; and (b) because it was after sundown, Plaintiff, as an observant Orthodox Jew, would not have access to or be monitoring any electronic communications or be able to guide her client. This was a violation of Defendant Balestriere's ethical obligation under 22 NYCRR 1200, Rule 4.2(a), to refrain from contact with a represented person.

70      A paralegal at Defendant Balestriere's law firm emailed Plaintiff after sundown that night, at 7:28 p.m., September 20, 2017, attaching another copy of the draft complaint and a letter from Defendant Balestriere addressed to Plaintiff and the other putative defendants. In the letter Defendant Balestriere states, "In light of this impending litigation against you" they had an obligation to preserve documents relating to the "potential litigation regarding the torts you and co-conspirators have committed . . ." (copying Defendant Balestriere).

71      Notably, the cover letter (that was mailed directly to Rubin's home) was another direct communication from the Balestriere Firm to Rubin, at a time when Defendant Balestriere knew that Rubin was represented by Plaintiff. This direct communication was a violation of 22 NYCRR 1200, Rule 4.2(a). The letter was another salvo in Defendant Balestriere's fear campaign.

72      The very next day, September 21, 2017, at 3:57 p.m., Defendant Balestriere's paralegal emailed Plaintiff (copying Defendant Balestriere) attaching a summons with notice

filed by the Balestriere Defendants in Queens County, New York. At 7:07 p.m., on September 21, 2017, the paralegal, maintaining the harassing pace of communications to Plaintiff, again emailed the summons with notice, along with a cover letter from Defendant Balestriere.

73      In his cover letter, Defendant Balestriere makes clear that the unnamed acts of "assault, battery, false imprisonment, and intentional infliction of emotional distress" in the summons with notice relate to the allegations of the draft complaint. Defendant Balestriere's cover letter uses the same language as in his document preservation demand, "the referenced litigation regarding the torts you and co-conspirators have committed . . ." and demanded $9 million in damages -- intriguingly similar to the $9.95 million demanded by Aloi.

74      Significantly, **THE FILED SUMMONS WITH NOTICE DID NOT NAME PLAINTIFF AS A DEFENDANT**; it listed only Rubin and Powers. This was the carrot to the stick of the draft complaint. The Defendant Balestriere was signaling to Plaintiff that she could avoid being a defendant, if Plaintiff convinced Rubin to settle.

75      This was not the only signal from Defendant Balestriere to Plaintiff – when Defendant Balestriere felt optimistic about Plaintiff's potential cooperation in bringing about a settlement, he addressed her as "Ms. Schnur" or "Yifat." When he felt she was resisting, he referred to her as "defendant" or "defendant Schnur."

76      On September 25, 2017, at 8:40 a.m., Plaintiff responded to Defendant Balestriere that she would accept service of the summons with notice on behalf of "my client Mr. Howard Rubin." Defendant Balestriere emailed back at 11:52 a.m. on September 25, 2017, asking to speak that day.

77     Despite Plaintiff having agreed to accept service on behalf of Rubin, Defendant Balestriere continued their severe pressure tactics, serving Rubin at his home that same day, where his family might learn of the filing.

78     Plaintiff sent Defendant Balestriere an email at 3:17 p.m. on September 25, 2017, responding to Defendant Balestriere's 11:52 a.m. email. Plaintiff's response definitively setting out her position: "I have reviewed the draft complaint which was sent via email on September 20, 2017.  The alleged facts as stated therein are fraudulent and without basis, and as such, no response is necessary."  Plaintiff went on to castigate Defendant Balestriere for reaching out directly to Rubin, despite knowing that Rubin was represented by Plaintiff.

79     The next day, September 26, 2017, at 10:49 a.m., McNeil (an associate at Balestriere's law firm) emailed Plaintiff a letter from Defendant Balestriere.  Defendant Balestriere again asked for a settlement discussion, and doubled down on his allegations: "Your warnings in your letter are a meritless attempt to distract from your clients' and his co-conspirators' yearslong human trafficking and related misconduct in violation of [RICO], the Trafficking Victims Protection Act ("TVPA") and other laws.  The Rubin-led RICO human trafficking conspiracy resulted in the rapes and beating of not only my clients, but of many others as would be uncovered in discovery, with such victims very likely seeking to join our lawsuit if we file."

80     With regard to the merits of the allegations, Defendant Balestriere went all in, "We have been engaged by our clients for some time now, and have thoroughly investigated our clients' claims, including conducting multiple interview[s] recovering a substantial amount of evidence."

81      To round out his threats, Balestriere included a photo of Rubin and K. Rico together, as well as pictures of K. Rico's supposedly injured breast.

82      Notably, this barrage of threats all come in just a single week.

83      On October 3, 2017, at 1:51 p.m., Plaintiff wrote to Defendant Balestriere setting forth her flat denial of the allegations against her and the legal baselessness of the claims as to her.  Plaintiff noted that the allegations as to her "interactions" with Lytell were false and that Plaintiff never sought to take over the representation of Lytell's open assault case.  Plaintiff also informed Defendant Balestriere that *Plaintiff had never communicated with Lytell*.  Plaintiff stated that even if the allegations about her drafting the NDA's and the release were true, this constituted (at most) the provision of professional services by Plaintiff.  Plaintiff cited a number of cases including *Reves v. Ernst & Young*, 507 U.S. 170 (1993) and *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248 (S.D.N.Y. 1997) that demonstrated that Plaintiff's alleged provision of such professional services could not serve as the basis for RICO claims against Plaintiff.  Moreover, Defendant Balestriere who had repeatedly boasted to Plaintiff about his experience in RICO matters, must have been already aware of this authority, and of the complete fatal legal and factual defects in his claims as to Plaintiff.

84      Over the next two weeks, from October 3 through October 15, 2017, Defendant Balestriere repeatedly requested a settlement discussion with Plaintiff.  On October 16, Plaintiff responded in writing.  Plaintiff expressly denied the truth of the allegations of the complaint, and said in no uncertain terms, **"[M]y client, as a matter of principal, will not pay any amount of money to avoid extortion, regardless of the consequences."**

85      On October 19, 2017, at 10:38 a.m., Defendant Balestriere's paralegal emailed to Plaintiff another letter from Defendant Balestriere and attached a fourth copy of the draft

complaint. In this letter Defendant Balestriere responds to Plaintiff's denials, and informs

Plaintiff that the complaint will be filed the following week unless Plaintiff comes to the table.

Reflecting Defendant Balestriere's escalating anger at Plaintiff for resisting Balestriere's efforts

to force Rubin to pay, Defendant Balestriere threatens he will seek damages against Plaintiff for

"witness tampering" and that his demand to settle the case is now $32 million (compared to the

$9 million sought in the summons with notice).

### Defendant Balestriere Agrees To Assume Liability for Conduct of Co-Counsel Jeremy Saland

86      Suspected, but unbeknownst to Plaintiffs at the time, but since revealed through

discovery in the State Lawsuit, Jeremy Saland was Balestriere's co-counsel in representing the

EDNY Plaintiffs, and Saland drafted many of the specific false allegations about Schnur that

were ultimately included in the complaint in that action.

87      On or about September 5, 2017, Defendant Balestriere and Jeremy Saland entered

into an agreement to divide any contingency fee awarded in the Sham Action.

88      Under Rule 1.5(g) of the New York Rules of Professional Conduct, fee splitting

arrangements are only permissible if (i) "the division is in proportion to the services performed

by each lawyer" or (ii) "each lawyer assumes joint responsibility for the representation."

89      In accordance with Rule 1.5(g), Defendant Balestriere and Jeremy Saland chose

to assume joint responsibility for the representation as evidenced by an August 21, 2017 retainer

agreement with the Original EDNY Plaintiffs that expressly provided that "The Firm [(defined as

Balestriere Fariello)] and Crotty Saland assume joint responsibility for the representation . . . the

division of the Success Fee is based upon this joint responsibility."

90      By assuming joint responsibility in accordance with Rule 1.5(g), Defendant

Balestriere and Jeremy Saland accepted "financial and ethical responsibility for the

21

representation *as if the lawyers were associated in a partnership*." Rule 1.5(g), Cmt. 7 (emphasis added).

91      On October 18, 2017, Jeremy Saland e-mailed the Balestriere Defendants, indicating he had reviewed the draft complaint in the Sham Action and providing comments on two specific paragraphs about Ms. Schnur.

92      On October 23, 2017, at 10:35 AM, Jeremy Saland e-mailed Defendant Saland a lengthy, and false, narrative regarding Ms. Schnur intended to edit paragraphs already in the complaint, with the express intention his narrative be incorporated into the Sham Action complaint.

93      Just a few minutes later, at 10:44am October 23, 2017, an associate at Defendant Balestriere's firm who appears to have taken the pen in drafting the Federal Complaint at this time, responded "Thanks, this is great, I will incorporate."

94      Not only was Saland's false narrative *intended* to be incorporated into the Federal Complaint, but Jeremy Saland's own words were in fact added to the Complaint. Comparing the Complaint filed in the Sham Action on November 2, 2017, with the narrative supplied by Saland on October 23 shows Saland's narrative was incorporated nearly word-for word into the complaint in the Sham Action.

| Saland October 23 E-Mail Narrative | Sham Action Complaint |
| --- | --- |
| From the time the criminal prosecution of Defendant Lytell commenced, the Enterprise paid for her lawyer—Jeremy Saland—and refused to pay additional fees if the matter proceeded to trial because Lytell began speaking with counsel in this case. At the time Lytell retained Saland, Saland was unaware of the Enterprise, its scheme or its members. | 286. From the time the criminal prosecution of [Lytell] commenced, the Enterprise paid for her lawyer—Jeremy Saland—and refused to pay additional fees if the matter proceeded to trial because [Lytell] began speaking with counsel in this case.  At the time [Lytell] retained Saland, Saland was unaware of the Enterprise, its scheme, or its members. |

| Saland October 23 E-Mail Narrative | Sham Action Complaint |
|---|---|
| On August 16, 2017, Lytell sent an email to Saland, drafted by Schnur, authorizing Saland "express permission to share any and all information in regards to [Lytell's] case with Ms. Schnur." Shortly after receiving this mail, Saland spoke with Lytell who advised that the Enterprise had flown Lytell into New York to meet with Rubin, Schnur and Powers. Further, the Enterprise sought to pay Lytell $80,000.00 to sign a retainer with Schnur and a confidentiality agreement so that Lytell would refrain from disclosing anything about Rubin and the Enterprise. Saland was unaware of any of these communications or the planned meeting despite Rubin, Schnur and Powers knowledge that Saland was and remained Lytell's counsel. | 288. On August 16, 2017, [Lytell] sent an email to Saland, drafted by Schnur, authorizing Saland "express permission to share any and all information in regards to [Lytell's] case with Ms. Schnur." Shortly after receiving this email, Saland spoke with [Lytell] who told him that the Enterprise had flown [Lytell] into New York to meet with Rubin, Schnur, and Powers. Further, the enterprise sought to pay [Lytell] $80,000 to sign a retainer with Schnur and a confidentiality agreement so that [Lytell] would refrain from disclosing anything about Rubin and the Enterprise. Saland was unaware of any of these communications or the planned meeting despite Rubin's, Schnur's, and Powers's knowledge that Saland was and remained [Lytell's] counsel. |
| Upon learning of this planned meeting between Lytell, Rubin, Schnur and Powers, Saland contacted Schnur with the permission of Lytell and advised Schnur both through a text message and on the phone that she, or any member of the Enterprise directly, through third parties or otherwise, could not communicate with Lytell. Saland reasserted that he remained Lytell's counsel. Saland explained to Schnur that despite Schnur's contention that her interest was to protect Lytell, Schnur in fact had an ethical conflict in that Schnur sought to solely protect the interests of Rubin. | 289. Upon learning of this planned meeting between [Lytell], Rubin, Schnur, and Powers, Saland contacted Schnur with the permission of [Lytell] and advised Schnur both through a text message and on the phone that she, or any member of the Enterprise directly, through third parties or otherwise, could not communicate with [Lytell]. Saland reasserted that he remained [Lytell's] counsel. Saland explained to Schnur that despite Schnur's contention that her interest was to protect [Lytell], Schnur in fact had an ethical conflict in that Schnur sought to solely protect the interests of Rubin. |
| Throughout the evening of August 16, 2017, Powers repeatedly called and texted Lytell attempting to convince Lytell to meet on the evening of August 16, 2017 as planned, despite Saland's specific instructions to Schnur that neither she nor any third party should communicate with Lytell. In one communication, Powers made a veiled threat | 290. Throughout the evening of August 16, 2017, Powers repeatedly called and texted [Lytell], attempting to convince [Lytell] to meet on the evening of August 16, 2017, as planned, despite Saland's specific instructions to Schnur that neither she nor any third party should communicate with [Lytell]. In one communication, Powers made a veiled threat |

| Saland October 23 E-Mail Narrative | Sham Action Complaint |
|---|---|
| to Lytell stating, "I'm not sure who's going to fund what you're doing with [Saland]." | to [Lytell] stating, "I'm not sure who's going to fund what you're doing with [Saland]." |
| The following day, Powers texted Lytell, "We've always taken care of you [because] we completely understand…we want to help you, we need to meet[.]" | 291. The following day, Powers texted [Lytell], "We've always taken care of you [because] we completely understand . . . we want to help you, we need to meet[.]" |
| On XXX, Powers texted Lytell and K. Rico, that both Lytell and K. Rico were "plain rude and ungrateful by deliberately no answering [her] phone calls or returning [her] messages." Powers claimed that she only had the best interests of Lytell and K. Rico in mind. However, they should "keep in mind that both [Lytell and K.Rico] violated the [Non-Disclosure] agreement." | 292. Later that month, Powers texted [Lytell and Rico], that both [Lytell and Rico] were "plain rude and ungrateful by deliberately not answering [Powers's] phone calls or returning [Powers's] messages." Powers claimed that she only had the best interests of [Lytell and Rico] in mind. However, they should "keep in mind that both [Lytell and Rico] violated the [Non-Disclosure] agreement." |
| On XXX, concerned that the Enterprise had lost control of and access to Lytell, Powers on behalf of the Enterprise, again communicated with Lytell advising in substance that although the Enterprise paid the initial fee for Saland, [Lytell] can still call [Powers] if a final bill is presented." | 293. Concerned that the Enterprise had lost control of and access to [Lytell], Powers, on behalf of the Enterprise, again communicated with [Lytell] advising in substance that "although the Enterprise paid the initial fee for Saland, [Lytell] can still call [Powers] if a final bill is presented." |

**The Bogus Tolling Agreement Push**

95      On October 24, 2017, at 4:19 p.m., Plaintiff emailed Defendant Balestriere. Plaintiff informed Defendant Balestriere that her clients would consider a nominal settlement, but were concerned about the impact of a settlement with the ongoing criminal investigation of Aloi. Plaintiff mentioned that a representation from the Original EDNY Plaintiffs as to their relationship with Aloi should be part of a settlement.

96      Within the hour, at 4:56 p.m., October 24, 2017, Defendant Balestriere insisted that there will be no settlement without a tolling agreement, "executed by both [Plaintiff] and Rubin by 10am tomorrow [or] we shall file the most up to date complaint tomorrow . . ." At 5:16

p.m., Defendant Balestriere's paralegal then forwarded the tolling agreement to Plaintiff (copying Defendant Balestriere).

97      At 7:33 p.m., October 24, 2017, Plaintiff pointed out that there were no limitations about to run, and that she would not be able to get a signature by that time.

98      Half an hour later, at 8:03 p.m. on October 24, 2017, a once again furious Defendant Balestriere responds: "[Y]ou will by 10 am tomorrow, Wednesday, send to me the exact tolling agreement, without modification which [my paralegal] emailed you earlier, signed by both you and Rubin, or we shall tomorrow, Wednesday, file the most up to date complaint in federal court."

99      On Wednesday, October 25, 2017, at 8:33 a.m., Plaintiff emailed Defendant Balestriere to let him know that her client will sign the tolling agreement, but can't by 10 a.m. Plaintiff says that she will get a copy to Defendant Balestriere that day.

100     At 9:57 a.m., October 25, 2017, Defendant Balestriere raged in his response: "This is not good enough. Both you and your client need to sign the tolling agreement. . . . You will email me by noon today with (1) confirmation that both you and Rubin will sign the exact tolling agreement [my paralegal] sent you yesterday; and (2) a definite time today before 5 pm [or the case would be filed]."

101     Having not received a response to his latest threat by exactly noon, at 12:04 p.m., October 25, 2017, Defendant Balestriere wrote a largely non-sensical email to Plaintiff: "Your conduct leads me to believe that you are not in fact representing Rubin but have only been seeking your own interests here.  As such, even if you told me that you would accept service I cannot be sure that your co-defendant actually would receive the complaint.  As such, we shall personally serve him at his home."  Defendant Balestriere never explains how not settling and

having the Sham Action filed would advance Plaintiff's interests, in light of the devastating allegations that would be published about Plaintiff.

102     The real reason Defendant Balestriere had nothing logical to say about the tolling agreement is that the tolling agreement was itself a sham.  There was no point to it and no urgency.  Defendant Balestriere had already filed a summons with notice as to Rubin.  Thus, they would not need a further tolling agreement.  With regard to Schnur, the false claims against her were based on RICO, and had years yet on the limitations period.

103     That is why when only Rubin signed the tolling agreement, Defendant Balestriere agreed to hold off filing.  Even though Defendant Balestriere had expressly stated that Plaintiff must also sign and Rubin's signature alone was "not good enough."  The entire exercise was just one more ploy to harass and pressure Plaintiff.  That Plaintiff remained the target of this pressure campaign is evidenced in text messages between Original EDNY Plaintiffs Lytell and Moore.  In these messages they confirm their view that it is Plaintiff who is the barrier to a settlement: "Yifat is a fake a@@ annoying b@tch that's gonna allow all of this to explode . . ."[6]

104     Defendant Balestriere continued his campaign of harassing Plaintiff.  On October 25, 2017 at 8:02 p.m., he wrote to Plaintiff, "[Y]ou have avoided talking to me.  You must speak to me by Monday, October 30, at 1pm, otherwise . . . [defendants] will thus file whatever is the most up to date complaint on Monday."

105     Plaintiff and Defendant Balestriere had a settlement call on October 31, 2017. Plaintiff offered a "nominal settlement," Defendant Balestriere reiterated his demand for $32

---

[6]  This is from text messages between Moore and Lytell, dated October 31, 2017 at 8:25 p.m. In the texts, the expletives were spelled out fully.  Out of respect for the Court, Plaintiff has used filler characters here.

million. When Plaintiff stated her client had engaged in completely consensual BDSM and would not pay $32 million, Defendant Balestriere called Plaintiff a "moron," mocked her as having no idea what she was doing and said make a counter offer or the case would get filed.

106     After some additional back and forth between Plaintiff and Defendant Balestriere, during the day of November 1 through November 2, 2017, the Sham Action was electronically filed in the Eastern District of New York, the evening of November 2, 2017.

## The Defendant Balestriere, on behalf of their co-counsel Jeremy Saland and the Original EDNY Plaintiffs File the Sham Action

107     Having failed to break Plaintiff's resolve, after weeks of threats and harassment, Defendant Balestriere shifted his strategy. Defendant Balestriere would never get Rubin to settle before filing, because of Plaintiff's strong and principled defense. Therefore, Defendant Balestriere would go forward with the Sham Action, betting that Rubin would fold before the case proceeded toward judgment.

108     Of course, there was no reason at this point to continue targeting Plaintiff. Defendant Balestriere could have filed his case against Rubin, leaving Plaintiff out of it altogether. However, as the history of the negotiations, Defendant Balestriere's rage and mocking contempt, and Lytell and Moore's texts all show, Defendant Balestriere and the Original EDNY Plaintiffs were livid with Plaintiff. Plaintiff had frustrated their plan for an easy and lucrative payday, and thus Plaintiff had to be destroyed.

109     Further evidence of Defendant Balestriere's malice can be seen from the protective orders. Defendant Balestriere moved for and obtained an order allowing the EDNY Plaintiffs to proceed under pseudonyms, thus ensuring their anonymity. When opposing counsel proposed sealing the entire case, Defendant Balestriere rejected the idea. Of course, they did; the

whole point now was to punish Plaintiff by destroying her reputation.  This could not be accomplished if the case were fully sealed.

110     On November 2, 2017, the Balestriere Defendants and the Original EDNY Plaintiffs filed the Sham Action via e-filing in the United States District Court for the Eastern District of New York.  They also filed an accompanying "RICO Statement," a supplemental document required by the Eastern District that more fully spells out the allegations relating to any RICO claims.  The papers were each signed by Defendant Balestriere

111     As set forth in more detail below, these filings were every bit as horrific as threatened.  They accused Plaintiff of participation in a gruesome conspiracy of violent rape, with graphic and explicit pornographic descriptions of sexual torture.

112     The complaint and the RICO statement filed contained false, defamatory statements as to Plaintiff. Defendant Balestriere knew them to be false both prior to and at the time of the filing of the Sham Action.  Despite the lack of any facts regarding Plaintiff whatsoever, and despite the heightened pleading standard required for a RICO filing, of which Defendant Balestriere was undoubtedly aware[7], Defendant Balestriere included Plaintiff in the RICO enterprise allegations. The complaint in the Sham Action is annexed hereto as Exhibit 2.

113     The original complaint and RICO statement are together some 100 pages long. The amended complaint and amended RICO statement total almost 190 pages, the second amended complaint 105 pages. The documents are scatter shot through with false and

---

[7] "Under Supreme Court and Second Circuit authority, acting as an attorney for an alleged RICO enterprise, without any further participation in its management or direction, is not enough for the attorney to be considered a member of the enterprise." *Lawson v. Rubin*, 2018 WL 4861380, at *2 (E.D.N.Y. Oct. 5, 2018) (citing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521-22 (2d Cir. 1994); *Reves v. Ernst & Young,* 507 U.S. 170, 177-83 (1993)).

defamatory statements about Plaintiff.  In some instances, she is lumped in with all "defendants," or "the enterprise."

114     To be clear every statement in those documents as to Plaintiff Schnur is patently false, other than that:

      a        Plaintiff drafted the Katrina Rico release agreement;

      b        Plaintiff, is an attorney;

      c        Plaintiff lives in Edison, New Jersey

                Plaintiff is a former assistant district attorney (but in Kings County, not Manhattan); and

      d        Plaintiff represented Rubin in connection with the prelitigation negotiation and continues to counsel Rubin in the EDNY matter.

115     Every group-pleaded reference to Plaintiff (*e.g.*, "Defendants", the "enterprise" or the "conspirators") is false.  Plaintiff did not engage in a conspiracy. Plaintiff did not manage or control a criminal enterprise. Plaintiff did not violate any laws or ethical obligations.

116     As to those allegations particular to Plaintiff the false allegations include:

      a        "Schnur, One of Rubin's Attorneys, Joins the Enterprise and Furthers the Goals of the Conspiracy."

                **Plaintiff did not join an enterprise or conspiracy or work for the goals of any such conspiracy. There never was any enterprise nor conspiracy.**

      b        "63. Yifat Schnur, a former prosecutor in the Manhattan District Attorney's Office, represents Howard Rubin in connection with the Enterprise's activities."

                **Schnur was a prosecutor in King's County (not New York County), and never represented Rubin with regard to any "enterprises" activities. There was never an enterprise.**

      c        "64. Schnur drafts the non-disclosure agreements ("NDAs") that are provided to the victims prior to meeting Rubin, in the Enterprise's illegal attempt to prevent disclosure of the Enterprise's crimes."

**Schnur did not draft the NDAs.**

d      "65. Schnur also aides in obstructing justice and intimidating witnesses through her role as an attorney, attempting to represent those injured by the Enterprise so that they do not report the workings of the Enterprise."

    **Schnur did not obstruct justice or intimidate any witnesses. There was no pending or contemplated criminal action as would be required for such a cause of action to even exist. Nor did she ever attempt to represent any of the EDNY Plaintiffs.**

e      "281. Schnur agreed to represent [Lytell], despite obvious conflicts of interest, and violations of her duties as an attorney."

    **The entire statement is false. As explained in detail above and below, Plaintiff never asked or agreed to represent Lytell, had no conflicts of interest and did not violate any duties, and in fact never communicated with Lytell or any of the EDNY Plaintiffs in any manner whatsoever.**

f      "280. As recently as August 18, 2017, Rubin and Powers attempted to convince [Lytell] to terminate her criminal attorney and allow Rubin's attorney, Schnur, to represent [Lytell] in her criminal action."

    **This statement as to Schnur (and as to Rubin and Powers) is totally false. No one ever offered to have Plaintiff represent Lytell or attempted or agreed to have Plaintiff represent Lytell.**

117      The Defendant Balestriere made a series of false and defamatory statements in the RICO statement. A true and complete copy of the RICO statement is annexed hereto Exhibit 3.

118      The RICO statement states:

a      "Rubin, Powers, Shon, Schnur, John Doe, Blue Icarus, and the Doe Company all associated with one another to engage in a systematic and extensive series of illegal acts that form a pattern and practice of racketeering activity. The Defendants associated to assault, batter, falsely imprison, intentionally inflict emotional distress, traffic, and tamper with its victims. Additionally, the Defendants associated to launder money and obstruct criminal investigations. These predicate acts include human trafficking in violation of 18 U.S.C. § 1591(a)(1); wire fraud in violation of 18 U.S.C. § 1343; laundering of monetary instruments in violation of 18 U.S.C § 1956; transportation for illegal sexual activity in violation of 18 U.S.C. § 2422; obstruction of criminal investigations in violation of 18 U.S.C. § 1512(d)(2); tampering with a witness through intimidation in

30

violation of 18 U.S.C. § 1512(b)(1)(A); and potentially other improper acts."

**Plaintiff did not associate as part of a criminal enterprise. Plaintiff did not participate in or commit any of the alleged crimes or acts. There was not and there is not any pending criminal investigation.**

a    **IV. Schnur**

i    **"b. Misconduct of Schnur:** Schnur drafted the non-disclosure agreement all of the victims signed before meeting Rubin. Schnur also drafts all of the legal documents to cover up the activities and crimes of the Enterprise as well as to prevent the victims from exposing the Enterprise's secrets. Additionally, Schnur has offered to defend [Lytell] in the criminal action that was brought against her because of her involvement with the Enterprise in an effort to ensure [Lytell] does not disclose anything about the Enterprise."

**Plaintiff did not draft the non-disclosure agreement. Plaintiff drafted a three-page release agreement that Rubin presented to Katrina Rico. Plaintiff did not offer to Lytell and never spoke or communicated with Lytell. Plaintiff was not part of nor did Plaintiff manage or control an Enterprise. Nor did any such enterprise ever exist.**

ii    **"c. Basis of Liability of Schnur:** Schnur participated and conspired to participate in the predicate acts that form the pattern of racketeering activity which injured at least the Plaintiffs [Lytell], Moore, and Rico]."

**This statement is completely false.**

b    "Schnur drafted the non-disclosure agreement signed by all of the victims and attempted to represent at least one victim after her relationship with the Enterprise resulted in her being criminally charged. Schnur has also attempted to convince victims to sign agreements after they have been assaulted by Rubin to keep them quiet. "

**Plaintiff did not draft the non-disclosure agreement. Plaintiff drafted the three-page release agreement that Rubin presented to Katrina Rico. Plaintiff never communicated with any of the EDNY Plaintiffs in any manner whatsoever.**

c    "Defendant Schnur drafted legal documents to keep the victims quiet and issued threats when necessary to avoid exposure of the Enterprise."

**Plaintiff did not draft the non-disclosure agreements. Plaintiff never**

**communicated with any of the EDNY Plaintiffs in any manner whatsoever. Plaintiff never issued any threats. Plaintiff was not part of or working for or managing or supervising any "Enterprise." There never was any "Enterprise."**

119    Just as Defendant Balestriere anticipated, the Sham Action brought immediate, substantial and crucifying press coverage.

120    On November 3, 2017, Saland joined Defendant Balestriere in a press barrage, e-mailing numerous reporters about the action they had just filed. In these communications, both Saland and Defendant Balestriere repeatedly referred to each other as their "co-counsel" in e-mails to reporters attempting to widely publicize the Sham Action, and Defendant Balestriere confirmed that "[b]oth our firm – Balestriere Fariello – and Jeremy's firm – Crotty Saland PC – have been engaged by all three plaintiffs and represents [sic] all three plaintiffs."

121    On November 3, 2017, following the filing of the Sham Action, Saland wrote in an e-mailed statement to New York Post reporter Rebecca Rosenberg that "Defendant Schnur for the benefit of and to protect Mr. Rubin, contacted my client in an attempt to silence her, pay her monies, and have her sign an agreement," and that "[b]ut for my call and text to Defendant Schnur to refrain from any direct or third party contact with my client, Defendant Schnur could have succeeded in taking advantage of a vulnerable person."

122    At 2:10 a.m. on November 3, 2017 – more than six hours before the Sham Action papers became available for public viewing, the NY Post broke the story.[8] Incredibly, that includes a quote from Saland. How could the NY Post have obtained a quote from a lawyer not even counsel of record in a case not yet publicly available? Discovery in this action has shown that, Rebecca Rosenberg had been provided with a copy of the complaint in the Sham Action

---

[8] The complaint was not available on PACER for public viewing until after 8 a.m. the morning of November 3, 2018.

directly from Defendant Balestriere and Jeremy Saland, on behalf of their joint clients, the

Original EDNY Plaintiffs. Rebecca Rosenberg is the NY Post reporter to whom Robert Aloi

threatened to reveal Rubin's private life, if Aloi's extortionate demands were not met. Aloi had

provided Plaintiff with Rosenberg's personal cell phone number in an attempt to make Plaintiff

take Aloi's threats seriously. Rosenberg attempted to contact Plaintiff from that exact cellphone

number on November 3, 2017.

123     At 4:32 pm on November 3, 2017, Defendant Balestriere wrote to Rebecca

Rosenberg via email that "Jeremy told me he contacted you re: ***Schnur. I think you know what***

***we know as laid out in the complaint -- her conduct is particularly horrible as she is a former***

***ADA-- but I can answer questions if you wish***."

124     At 4:37 pm, Rosenberg responded "Yes. We'd love a comment on the egregious

conduct of Yifat and Powers."

125     At 5:43 pm on November 3, 2017, Defendant Balestriere responded:

> I think our clients' complaint speaks for itself on Powers and, really, all
> defendants.
>
> But I must say that as a former sex crimes, domestic violence, and organized
> crime prosecutor, ***I find Defendant Schnur's conduct*** in enabling Rubin to
> run his enterprise -- including providing unenforceable non-disclosure
> agreements to the victims, duping them into believing that they could not
> tell the truth about what happened -- ***completely reprehensible***. I know
> Jeremy feels the same.

126     These vitriolic statements from Defendant Balestriere further demonstrate his

malice.

127     Likewise, on November 3, 2017, Brian Schwartz, a reporter from Fox News,

emailed with Defendant Balestriere and Jeremy Saland concerning the allegations in the Sham

Action. At 12:22pm, Defendant Balestriere wrote to Brian Schwartz, that his staff would send "a

copy of the complaint and [press] statement. If you have questions after that please direct them to me."

128     On that same day, a Fox News article was published with the headline "Soros fund manager raped, beat Playboy models, $27M lawsuit alleges" covered the allegations. Quoting Defendant Balestriere, the article includes a clear reference to Plaintiff:

> Rubin collaborated with two female fixers and a lawyer who sought to "cover up" his "sexual misconduct and criminal abuse of women and to serve as a cover for his wide-ranging human trafficking scheme," Balestriere added.

> A true and complete copy of this article is annexed hereto as Exhibit 18

129     The allegations against Plaintiff in the Sham Action complaint, which Defendant Balestriere incorporated into his communication with Rosenberg, Schwartz, and other reporters, were and are false, and were made knowing they were false in order to bolster the Sham Action and to injure Plaintiff. Even though Defendant Balestriere knew that Plaintiff was entirely innocent he purposefully and maliciously directed the press to focus on Plaintiff to ensure that his false allegations did the maximum damage to her.

130     Moreover, Defendant Balestriere prepared and shared a press release concerning the Sham Action to further disseminate the false allegations against Plaintiff. The press release stated:

> Rubin and his co-conspirators (including a former prosecutor) worked together in the Enterprise which lied to women to lure them to travel across the United States to a secret penthouse Rubin controlled in Midtown Manhattan.

The "former prosecutor" is a clear reference to Plaintiff. A true and complete copy of the press release is annexed hereto as Exhibit 19.

131     Defendant Balestriere knew the allegations against Schnur were false, and because of his participation in drafting the very false allegations in the Sham Action complaint

which he was now spreading through the press, Defendant Balestriere cannot rely on any privilege to protect his defamatory statements to the press about Ms. Schnur.

132     On November 3, 2017, a spokesperson for Rubin and Plaintiff responded to Rosenberg's attempt to reach Plaintiff, and provided Rosenberg with a statement. In keeping with the salacious nature of the article, Rosenberg deliberately omitted reference to Aloi's extortion attempt of Rubin, arrest and indictment. Most news agencies included this highly relevant information.

133     Saland's heinous allegations against Plaintiff as made in his November 3, 2017 e-mail to Rebecca Rosenberg were quoted in a separate NY Post article published on November 3, 2017 at 7:05 p.m. Saland lied when he told the NY Post that he had confronted Schnur about her unethical conduct and repeatedly asked her not to contact Lytell.  "Defendant Schnur, for the benefit of and to protect Mr. Rubin, contacted my client in an attempt to silence her, pay her monies and have her sign an agreement," he said. "Defendant Schnur could have succeeded in taking advantage of a vulnerable person."

134     These statements by Saland were and are false, and were made knowing they were false in order to bolster the Sham Action Saland had helped germinate and to injure Plaintiff.  Saland knew they were false, and because of his participation in drafting the very false allegations in the Sham Action complaint which he was now spreading through the press, Saland cannot rely on any privilege to protect his defamatory statements to the press about Ms. Schnur.

135     The truth, as Saland knew both when he drafted the false allegations in the complaint and when he then spread those false allegation with further defamatory comments about Ms. Schnur to the press, is that Plaintiff never communicated with Lytell.  Plaintiff's only contact was with Saland.  On August 16, 2017, Saland himself initiated the only communication

with Plaintiff by calling Plaintiff's cellphone. Plaintiff never offered money nor attempted to represent Lytell. Notably, it would not have been unethical in any manner for Plaintiff to communicate with Lytell.

136    An avalanche of lurid coverage followed the filing of the Sham Action. This coverage was all brought forth by the barrage of e-mails sent by Defendant Balestriere and Saland to gin up coverage for their claims, including their false and outrageous claims about Ms. Schnur. These include, without limitation:

a    A November 3, 2017 article on Canoe.com in France, entitled "I am going to rape you like my daughter;" U.S. Financier sexually abused women in penthouse dungeon, suit claims. A true and complete copy of this article appears in the collective Exhibit 4. The article references the Post article, and refers to the aid received by Rubin from his "fixers" and "legal team," an identifiable reference to Plaintiff.

b    Soros Fund Manager Involved in Fifty Shades of Grey Style Lawsuit, is a headline from that same day on www.rt.com, which again references Rubin's' fixer and "lawyer" who held cover-up his actions. A true and complete copy of this article is annexed as part of Exhibit 4.

c    "Big Short" Millionaire Wall Street Trader Accused of Rape and Abuse in Manhattan Dungeon, reads the November 4, 2017 headline on newsweek.com. The article references that Rubin "worked with a lawyer" to "maintain anonymity." Again, this is an identifiable reference to Plaintiff, in particular given that the suit is expressly referenced. A true and complete copy of this article is annexed as part of Exhibit 4.

d    The Daily Beast headline on November 4, 2017 read: "Models Lured Women to Wall Street Dungeon." The article mentions that Rubin's lawyer "Yifat Schnur" is "also named as a defendant for allegedly drafting NDA's and trying to silence women after the fact." A true and complete copy of this article is annexed as part of Exhibit 4.

e    "Bear Sterns trader Howard Rubin 'raped and beat women," read a November 3, 2017 article in the Daily Mail On-line. This article recounts the allegations of the complaint and expressly notes that Plaintiff, a lawyer, is a defendant in the action. A true and complete copy of this article is annexed as part of Exhibit 4.

f    An article appeared in the Jewish Voice on January 12, 2018, entitled, "George Soros' Former Associate Charged with 4th Rape in Brutal S&M

Scandal."  The article refers to a new allegation regarding Rubin.  However, it also references the original Post Article and the allegations of the Sham Action, including stating that Plaintiff was a defendant in the Sham Action.  This was particularly damaging to Plaintiff as the Jewish Voice is widely read in her community.  A true and complete copy of this article is annexed hereto as part of Exhibit 4.

g    RT discussed the Sham Action in detail in an approximately ten-minute television segment.  One of the commentators Mike Papantonio, a lawyer himself, excoriated Plaintiff: "Yeah, I mean there's some lines a lawyer should not cross. One is to get involved in the cover up, one is to get involved in the process of victimizing these people a second time. So you know, hopefully when this is all over, they don't just pay out money, really what needs to happen here, in order to change things. What needs to happen, is they probably need to share a cell somewhere."

A true copy of the relevant portions of the transcript are annexed hereto as part of collective Exhibit 4.

137    These articles, and with them the malicious and false allegations against Plaintiff, were widely disseminated and read. The New York Post titled *Former Prosecutor Accused of Covering Up Portfolio Manager's Sex Dungeon* had over **40,000 web views** and along with over **280,000 print copies** of the article in circulation. Another article by the New York Post covering the allegations had **320,000 web views** and nearly another **330,000 print copies** in circulation. The Daily Beast article had over **410,000 web views**, the Daily Mail article has over **320,000 views**, and the Fox News article had over **380,000 views** and generated another **1.3 million impressions** on Facebook. This is just an illustrative sampling of the wide spread dissemination of the false allegations against Ms. Schnur that have been viewed millions of times.

**The Amended EDNY Plaintiffs Pile On**

138    On February 6, 2018, Plaintiff promulgated requests for admission to the Original EDNY Plaintiffs

139    On February 20, 2018, the Balestriere Defendants filed an Amended Complaint and Amended RICO statement.  A true and complete copy of the amended complaint is annexed

hereto as Exhibit 5. A true and complete copy of the amended RICO statement is annexed hereto as Exhibit 6. The papers were again signed by Defendant Balestriere.

140    Defendant Balestriere and Jeremy Saland also agreed to assume joint responsibility for the representation of the Amended EDNY Plaintiffs.

141    The Amended Complaint added four new plaintiffs, the "Amended EDNY Plaintiffs."

142    The Amended Complaint and Amended RICO statement are particularly brazen acts by Defendant Balestriere. By the time of the second filing, **Defendant Balestriere had Plaintiff's federally filed statement that Plaintiff did not represent Rubin before October 2016 as well as the pre-litigation letter from Plaintiff that showed the alleged provisioning of professional services could not serve as the basis for RICO claims. Yet, virtually all of the newly-added sick allegations in the Amended Complaint and Amended RICO statement relating to Plaintiff took place before** (and in some cases years before) October 2016.

143    To the extent the Amended Complaint repeats statements in the original complaint, Defendant Balestriere is liable for filing the claims and for the statements therein, on the same basis as for the original complaint.

144    The Amended Complaint, contained additional false and defamatory statements regarding Plaintiff.

145    These new allegations against Plaintiff include:

a    "49. Upon information and belief, Schnur provided Rubin and his associates with the non-disclosure agreements (the "NDAs"), knowing that the Enterprise intended to use such agreements to cover up its conspiracy, and continues to do so to this day."

**Plaintiff did not draft or provide Rubin or anyone else with the NDAs.**

**There was never any Enterprise or conspiracy. Plaintiff did not ever act to cover any such fictitious conspiracy.**

b       "61. Schnur participated in the direction or conduct of the affairs of the Enterprise by serving as an advisor to the Enterprise, counseling the Enterprise how to best cover up its crimes for the express purpose of hindering or delaying Plaintiffs and other victims of the Enterprise from coming forward with information regarding those crimes. Schnur even went so far as to interfere with the attorney-client relationship between Plaintiff [Lytell] and her criminal [defense] attorney in order to protect the Enterprise. Schnur knew or at least acted in reckless disregard of the fact that means of force and coercion would be used to cause women to engage in commercial sex acts. Schnur was paid for her services by Rubin individually or by the Doe Company."

      **Plaintiff did not participate in the direction or conduct of any Enterprise, and never covered up or counseled anyone to cover up crimes. Plaintiff never interfered with the Lytell representation or have any knowledge or reckless disregard for the existence of the acts alleged. In sum, every part of this paragraph is false, except that Plaintiff was paid for her representation of Rubin for the release agreement.**

c       "Schnur Engaged in Two or More Predicate Acts Constituting a Pattern of Racketeering Activity."

      **Plaintiff never engaged in any "predicate acts" or criminal acts.**

d       "548. From February 2011, until the present, Schnur has engaged in a pattern of racketeering under 18 U.S.C. § 1961(1) on at least 6 separate occasions."

      **Plaintiff first represented Rubin in October 2016. She has not engaged in any racketeering activity at all, ever.**

e       "549. These predicate acts include the following:

i       a. Witness Tampering: Beginning in at least 2015 if not earlier, Schnur created a stock non-disclosure agreement at Rubin's direction. Schnur did not simply create a legal document for Rubin, but, instead, knew this non-disclosure agreement would be used to hinder, delay, or prevent women from communicating to law enforcement officers and courts Rubin's possible commission of multiple Federal offenses. Specifically, Schnur knew that, along with his associates, Rubin intended to bring women to New York to engage in commercial sex acts in violation. Schnur also knew that Rubin would use force or threats of force to coerce the women

39

to engage in these acts as Schnur was a part of the eventual cover up."

**Every part of this paragraph is false.**

ii     "b.  Violation of the TVPA: At the same time, Schnur was paid by the Enterprise for creating the stock nondisclosure agreement at Rubin's direction. Schnur thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiffs knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Plaintiffs to engage in commercial sex acts."

**Every part of this paragraph is false.**

iii     "c.  Witness Tampering: On or around October 4, 2016, Schnur drafted an unenforceable General Release Agreement between Rubin and [Rico] for the purpose of hindering, delaying, and preventing [Rico] from communicating to law enforcement officers and courts Rubin's actual commission of Federal offenses, including, without limitation using force to coerce [Rico and Lytell] to engage in commercial sex acts."

**Plaintiff drafted a three-page release agreement between Rubin and Katrina Rico. Beyond that, the allegations of this paragraph are false.**

iv     "d. Violation of the TVPA: On or around October 4, 2016, Schnur was paid by the Enterprise for creating the General Release Agreement between Rubin and [Rico]. Schnur thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited [Rico and Lytell] knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin had used means of force, threats of force, fraud, and coercion to cause [Rico and Lytell] to engage in commercial sex acts."

**Plaintiff drafted a three-page release agreement between Rubin and Katrina Rico. Beyond that, the allegations of this paragraph are false.**

v     "e. Witness Tampering: On or around August 16, 2017, Schnur, with Powers and Rubin, attempted to persuade Plaintiff [Lytell] to hire Schnur to represent her in a criminal action in New York Supreme Court when [Lytell] was already represented by defense counsel, Jeremy Saland. Schnur drafted an email for [Lytell] to send to her counsel, Saland, which directed Saland how to proceed

and raised the possible termination of Saland. Despite the obvious conflict of interest, Schnur's purpose in engaging in this conduct was to protect Rubin and his associates by preventing [Lytell] from revealing Rubin and his associates' commission of multiple Federal offenses to Saland and to any law enforcement officers."

**In effort to calm an increasingly frantic Lytell, Powers suggested to Lytell that Lytell authorize Saland to speak with Plaintiff. In fact, Plaintiff never contacted Saland. The only communication between Saland and Plaintiff was a thirteen-minute phone call initiated by Saland. Beyond that, this paragraph is false.**

vi      "f. Violation of the TVPA: On or around August 16, 2017, Schnur was paid by the Enterprise for her interference in [Lytell's] legal representation. Schnur thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiff [Lytell] knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin had used means of force, threats of force, fraud, and coercion to cause [Lytell] to engage in commercial sex acts."

**This paragraph is false.**

**146**    The Amended Complaint for the first-time **names Plaintiff as a defendant on the cause of action "against all defendants," for violation of 18 U.S.C. Sec. 1591-a (Human Trafficking). Plaintiff never participated in any of the acts alleged in the cause of action, nor in any violation of that statute or any other statute alleged.**

147    The Balestriere Defendants and EDNY Plaintiffs repeated the false allegations in the Amended Complaint. In addition, the Amended Rico Statement says: "Schnur has also attempted to convince victims to sign agreements after they have been assaulted by Rubin to keep them quiet." This statement is false. Plaintiff never communicated with any of the EDNY Plaintiffs.

148    In fact, during the court hearing on the Rule 11 motion, Defendant Balestriere conceded that his clients never alleged any direct contact with Plaintiff, thus rendering the statement that Plaintiff "threatened" them not just false but impossible. Exh. 9, p. 5.

149     From November 2, 2017, through February 20, 2018, Defendant Balestriere had

ample time to further investigate his clients' claims and records to establish a good faith factual

basis.  That he instead made more outrageous and yet more obviously false allegations

demonstrates that their conduct was calculated to inflict maximum harm on Plaintiff, without

regard to truth, ethics or the law.

150     Moreover, evidence uncovered in the State Lawsuit further showed that the

EDNY Plaintiffs never interacted with Plaintiff, and indeed some did not even know that

Defendant Balestriere sued Plaintiff on their behalf. These include, without limitation:

| EDNY Plaintiff | Deposition Testimony |
|---|---|
| Brittany Hassen | **Q.** Your testimony is that you never had any idea that you were suing Ms. Schnur?<br>**A.**·I have no, yes, that is my testimony. I thought I was suing [Rubin].<br>**Q.** No one from the Balestriere Firm ever informed you that you would be suing Ms. Schnur?<br>**A.** Never.· Never heard her name.<br><br>[ . . . ]<br><br>**Q**. And did Ms. Schnur ever threaten you in any way<br>**A**. Never spoke to her.<br>**Q.**·You never had the understanding that she was indirectly communicating with you in any manner?<br>**A.**·I never spoke to her.· At all.· Like I didn't even know who she was.<br>**Q**. You have no basis to believe that Ms. Schnur had any knowledge of anything that had occurred at the penthouse with Mr. Rubin and yourself, correct?<br>**A.**·She couldn't have.· I never met her. I have never even seen her before. |
| Emma Hopper | **Q.** Before you sued Mr. Rubin, you had·never met Ms. Schnur, correct?<br>**A.**·Correct.<br>**Q.**·You had never communicated with her by telephone?<br>**A.**·Correct.<br>**Q.** You have never communicated -- were you·going to add something?<br>**A.** I mean, I don't know who she is, so I have no idea but to my knowledge I have never·communicated with her.<br>**Q.**·And never comm |

| EDNY Plaintiff | Deposition Testimony |
|---|---|
| Brittany Reyes | **Q.** At the time you joined the lawsuit against Howard Rubin, you had never spoken to Ms. Schnur, correct?<br>**A**. Not to my knowledge.<br>**Q.**·You never communicated with her either, correct?<br>**A.**·Not to my knowledge.<br>**Q.**·And in fact, you had no idea who she was, at that time, correct?<br>**A.**·I never heard or saw her name until I was served the papers for this lawsuit. |
| Natasha Tagai | **Q.** Did you have any discussions about Ms. Schnur with Matt Schmidt, before the federal action was brought against Ms. Schnur?<br>**A.**·No, I was never, no one ever discussed Ms. Schnur with me even when I signed that.· You know I not a lawyer, so I signed a document not knowing what I was signing.· I thought I was just suing Mr. Rubin.<br><br>[. . . .]<br><br>**Q.** Beyond -- beyond the amended complaint, you have never met Ms. Schnur before?· Never heard of her before, is that right?<br>**A.**·No idea who she is.<br>**Q.**·You might have seen her name in an article, but you had no personal experience with Ms. Schnur, is that right?<br>**A.**·Correct, none whatsoever. |
| Amy Moore | **Q.**Your testimony is that before you filed the lawsuit against Mr. Rubin, you had never heard the name Yifat Schnur?<br>**A**. No, not to my knowledge, no.<br>**Q.**·Before?<br>**A.**·I don't remember hearing the name.· If the name was said to me, I don't remember it being said to me.<br>**Q.**·Did you ever, tell anyone at the Balestriere firm that Ms. Schnur had drafted a nondisclosure agreement, that you had been asked to sign?<br>**A.**·No, not to my knowledge, no.· I don't know her. |
| Mia Lytell | **Q.** Do you have a recollection of saying to them "I have never spoken to Ms. Schnur I don't know who she is"?<br>**A**. Yes, because I would never say any different.· Still to this day, I have never spoken to Ms. Schnur. |

151    Likewise, emails sent by the EDNY Plaintiffs in the course of the State Lawsuit

further show that EDNY Plaintiffs did not know Plaintiff. For example:

a    On February 9, 2023, Hopper wrote "[w]hen my attorneys filed my complaint against Howard Rubin I did not know who Yifat" and on November 21, 2023, " I do not know [Schnur]. She does not know me. She knows I did not mention her name in any case."

b      On November 28, 2023, Moore wrote "I would like to inform the courts that I do not know [Schnur], I have never named [Schnur] specifically nor intended in any way. I only became in knowledge of the [Schnur] when this suit came forward."

c      On October 10, 2024, Hassen wrote: "[Defendant Balestriere] is the worst lawyer I have ever met. . . . I just really don't understand why I'm involved in something [Defendant Balestriere] did on his own without even speaking to me. I feel bad that [Schnur] was plastered online in such a way I actually feel bad for her.  I feel lied to by [Defendant Balestriere] I feel like he lied to all of us."

**Discovery Begins in the Sham Action and the Scheme Unravels**

152     Plaintiff consistently maintained throughout the litigation that Plaintiff had not drafted the NDAs, and did not represent Rubin prior to October 2016. Far from pressuring, intimidating or coercing the EDNY Plaintiffs, the allegations were in fact an impossibility as Plaintiff never communicated with any of the seven EDNY Plaintiffs in any manner.  Defendant Balestriere has a a duty to inform his clients (the EDNY Plaintiffs) of statements made by Plaintiff in her federal court filings.  On September 26, 2017, in a pre-filing communication to Plaintiff, the Balestriere firm claims to have conducted extensive interviews of the Original EDNY Plaintiffs to ensure that their claims had factual support.

153     The Original EDNY Plaintiffs provided their responses to Plaintiff's request for admission on March 6, 2018.  A true and correct copy of the responses to the requests to admit are annexed hereto as Exhibit 7.  The requests to admit asked, simply and directly, whether each of the Original EDNY Plaintiffs had ever met, spoken or communicated through any medium with Plaintiff.  Every one of the Original EDNY Plaintiffs said they had not.  The requests asked

whether there was any indication on the NDAs as to who drafted them.  Every one of the

Original EDNY Plaintiffs stated they had no idea. [9]

154    Defendant Balestriere and the EDNY Plaintiffs had no basis to assert that Plaintiff

had drafted the NDAs, or attempted to get any of the EDNY Plaintiffs to sign an NDA or any

other agreement. Defendant Balestriere and the EDNY Plaintiffs had no basis to assert that

Plaintiff coerced, intimidated or threatened the EDNY Plaintiffs.

155    On November 29, 2017,[10] the Balestriere Defendants and EDNY Plaintiffs had

learned that Plaintiff had not worked for Rubin (let alone an alleged "enterprise") prior to

October 2016.  This fact alone destroyed their case:  Each of the EDNY Plaintiffs had signed an

NDA before, in some cases years before, Plaintiff ever knew Rubin.  All but one of the EDNY

Plaintiffs had multiple encounters with Rubin prior to the time Plaintiff worked for Rubin.

Moore signed the NDA in August 2016, when she had her first alleged encounter with Rubin.

Lytell also signed the NDA in August 2016, and allegedly had two encounters with Rubin prior

to October 2016. Rico signed the NDA in August 2016, and allegedly had two encounters with

Rubin prior to October 2016.  Tagai alleged she signed the NDA in 2011[11], and allegedly had

five or more encounters with Rubin, beginning in 2009 and before October 2016. Hopper alleged

that she had signed the NDA in March 2016[12] and allegedly had over half a dozen encounters

---

[9] There are no requests to admit nor interrogatory responses from the Amended EDNY Plaintiffs because a total stay of discovery was issued By Judge Cogan on March 7, 2018, fifteen days after the Amended EDNY Plaintiffs had joined the lawsuit. By the time discovery began again Plaintiff was no longer a party to the action.
[10] On November 29, 2017, Plaintiff filed a letter (Docket Number 32) requesting permission for Plaintiff to file a motion to dismiss. In that letter, Plaintiff made clear her representation of Rubin did not begin until approximately October 2016.
[11] Tagai actually signed an NDA on January 21, 2015.
[12] Hopper actually signed an NDA on October 12, 2015.

with Rubin prior to October 2016. Reyes signed the NDA in March 2016 and had her sole alleged encounter with Rubin at that time. Hassen signed an NDA in 2014, but allegedly began having encounters with Rubin in 2011, and had several alleged BDSM encounters with Rubin prior to October 2016.

156     Significantly, the EDNY Plaintiffs' deposition testimony in the Sham Action also demonstrates the utter bad faith, lack of factual basis for the fictitious claims against Plaintiff, and total abuse of the judicial system and its resources. Reyes testified at her deposition that she did not know who Plaintiff was, didn't know of any injury done to Reyes by Plaintiff, and didn't even know Reyes had sued Plaintiff. [TR. 164-165]. Hassen similarly testified that Hassen had no idea of why Hassen was suing Plaintiff, nor of any injury that Plaintiff had done to Hassen. [TR. 356]. The same was true of Hopper. Hopper testified that Hopper did not know who Plaintiff was, did not know if Hopper had ever met Plaintiff, and did not know if Hopper had ever talked to Plaintiff. [TR. 10-11]. Tagai testified that Tagai did not know what damages Tagai was suing for. [TR. 58-59].

157     Perhaps most shocking of all, text messages uncovered in discovery show that the Balestriere Defendants were knowingly lying to the Court. At 5:43 p.m. on November 3, 2017, as media is boiling over with stories about the Sham Action, Katrina Rico expresses to Lytell Rico's fear that they will now be put to their proof for their false allegations:

158     "I'm telling you now if everything is crumbling you are putting everyone in danger. **I told John we both weren't tied up.** That's the only thing I told him and he didn't seem pressed about it. At this point I don't know what to do anymore."

159     In other words, the Sham Action's allegation that Rubin bound both Rico and Lytell at the same time was fabricated.  Shockingly, Rico told this to Balestriere, and Balestriere "did not seem pressed about [the false allegations] it."

160     On February 28, 2018, Plaintiff moved to dismiss the claims against her as a matter of law.

161     On March 9, 2018, Plaintiff's counsel in the Sham Action sent a safe harbor letter to Balestriere and his firm, warning them that if they did not withdraw the claims against Plaintiff they would seek sanctions under FRCP 11 for frivolous litigation.  On March 29, 2018, The Balestriere Defendants replied refusing to withdraw the claims.

162     In a decision dated April 29, 2018, the federal court granted Plaintiff's motion to dismiss the claims against her.  A true and correct copy of that decision is annexed hereto as Exhibit 8.  In addition to the lack of **any** facts whatsoever, and its reliance on speculation, the Court dismissed the complaint as to Plaintiff because RICO claims cannot be brought against someone merely for providing professional services.  Indeed, the Court cited, among other cases, *Reyes v. Erns & Young*, 507 U.S. 170 (1993).  This is the argument and one of the very cases that Plaintiff had cited to Balestriere back on October 3, 2017, before the Sham Action was filed, warning Balestriere of the utter baselessness of the claims against Plaintiff.

163     On May 17, 2017, Plaintiff moved the federal court to impose those sanctions on Balestriere, McNeil and Balestriere Fariello.

164     The Court held an oral argument on the motion for sanctions on July 12, 2018. The decision of the Court was to impose Rule 11 sanctions and to direct Plaintiff to file a Rule 54 motion for attorneys' fees.  A true and complete copy of the transcript of that hearing is annexed hereto as Exhibit 9.

165     On October 5, 2018, the Court awarded $20,000 in sanctions against Balestriere

and Balestriere Fariello.  A true and correct copy of the Court's order is annexed hereto as

Exhibit 10.

### Despite Dismissal and Sanctions Defendant Balestriere Continues to Malign and Harass Plaintiff

166     Even after the Court dismissed the Sham Action's claims against Plaintiff and

sanctioned Balestriere and his firm for bringing claims without factual or legal basis, Defendant

Balestriere continued to publish lies about Plaintiff.  On August 17, 2018, one hundred and ten

(110) days after Plaintiff was dismissed from the Sham Action and thirty-six (36) days after

Defendant's were sanctioned for improperly suing Plaintiff, Defendant Balestriere filed a Second

Amended Complaint[13].  While Plaintiff is no longer a defendant in that complaint, the third

complaint filed in the Sham Action continues to allege, among other things that, "Schnur agreed

to represent [Lytell], despite obvious conflicts of interest, and violations of her duties as an

attorney." (Second Amended Complaint at ¶504). The complaint repeats the notion that Plaintiff

attempted to represent Lytell in Lytell's open Criminal matter.  This statement, and all of the

allegations that Plaintiff attempted to represent or agreed to represent Lytell are patently false.

Defendants knew these statements were false when they made them, yet they published these lies

again for the third time.

167     The documentary evidence and Lytell's deposition testimony confirm the falsity

of the allegations.  Lytell repeatedly communicated with Powers concerning her anxiety and

regarding the open criminal assault charge against Lytell.

---

[13] The Seconded Amended Complaint is the third complaint publicly filed in the sham action.

168      At Lytell's deposition, Lytell falsely testified that Powers suggested that Lytell fire Saland and hire Plaintiff. Lytell testified that Powers suggested Lytell effectuate this by an email to Saland that Powers would draft for Lytell and Lytell could cut and paste into an email.

169      The truth is established by the fact that the same communication is produced in discovery by both Powers and Lytell. The communication reads: "I am writing to express authorization for you to discuss my case with another attorney by the name of Yifat Schnur.  You have my express permission to share any and all information in regards to my case with Ms. Schnur.  Ms. Schnur can be reached at [phone number]."

170      When pressed about how this email in any way reflects an intention by Powers (let alone Plaintiff) to have Lytell fire Saland and hire Plaintiff, Lytell did not and could not explain.

171      The notion that this email was intended to communicate that Saland be fired and Plaintiff hired is ludicrous.  Even the federal court found the idea that such an email somehow constituted interference with a witness or obstruction (in a non-existent matter) absurd.

172      As Judge Cogan stated in dismissing the claims against Plaintiff, the whole allegation was that Plaintiff had Lytell send an email to Saland to take over Lytell's case.  But "if Schnur wanted to persuade [Lytell] 'knowingly . . . corruptly' or to be "intentionally harassing," as required by § 1512(b) (1) and (d)(4), why would she do it through a communication to [Lytell's] attorney, who had a duty of loyalty to [Lytell]?"   Decision on Motion to Dismiss, Dkt. 105 at p. 21.

173      It shocks the conscience that Defendant Balestriere would retain these allegations in the third complaint filed in the Sham Action, even after the claims against Plaintiff had been dismissed and after the Court imposed sanctions against Defendant Balestriere and his firm for

even including Plaintiff as a defendant.  This conduct demonstrates that the third round of filings

was simply another malicious act to destroy Plaintiff and demolish her reputation in a public

filing out of revenge.

### Defendant Balestriere Lost His Case Against Plaintiff but Won His War

174     Judge Cogan dismissed the claims against Plaintiff on April 29, 2018(Dkt. 105),

imposed Rule 11 sanctions upon Defendant Balestriere and his firm for naming Plaintiff in the

Sham Action (Dkt. 154) and imposed $20,000 of sanctions (Dkt. 189). Yet, Plaintiff's life,

health, relationships, business and reputation have been irreversibly devastated.

175     While there has been worldwide coverage of the Sham Action and its allegations,

there has been no coverage of Plaintiff's vindication.  The New York Post did not update the

story with a headline: "Sex Dungeon Scammers Claims Dismissed, Lawyers Sanctioned!"  Nor

have the Daily Mail, Rt.com, the Daily Beast, Fox News or talk radio recanted, or updated the

smears against Plaintiff.  Indeed, it is safe to say that no one, other than parties to this case has

read or plans to publish for the world to read Dkt. 105 dismissing Plaintiff, Dkt. 154 sanctioning

Balestriere, or Dkt. 189 imposing a monetary sanction.

176     In the Internet Age, the negative stories are forever.  Every time Plaintiff's unique

name is googled, the Sham Action and its lies will pop up.  Running a search for videos turns up

several scathingly malicious videos about Plaintiff concerning the Sham Action and its

underlying false allegations.[14]

---

[14] *See, e.g.,*
https://video.search.yahoo.com/search/video;_ylt=A2KLfR7PgyNbf.wAtXVXNyoA;_yl
u=X3oDMTByMjB0aG5zBGNvbG8DYmYxBHBvcwMxBHZ0aWQDBHNlYwNzYw--
?p=howie+rubin&fr=mcafee#id=7&vid=5144cbc968fbd273ff47d35c8e570481&action=vie w

177      Indeed, yet another negative article appeared just days before the filing of the State Lawsuit. This one dated October 26, 2018, in the sports magazine *Deadspin*, entitled: "Bucks Owner Wes Eden is Being Subpoenaed in the Wall Street Sex Dungeon Case." The article arises from the Balestriere Defendants attempts to subpoena the billionaire owner of the Milwaukee Bucks NBA franchise.  It contains now familiar quotes:

      a      "Rubin and his associates have lied to Plaintiffs and dozens of others, luring them across the country to assault them as part of a pattern of criminal sexual misconduct including beatings to the point of unconsciousness and acts of rape. Rubin even tells victims of the scheme that he will rape them after they are tied down but before proceeding to do so— threatening one victim, "I'm going to rape you like I rape my daughter"—as well as assault them and imprison them against their will."

      b      Proving the point supra, there is no mention in this article of the dismissal of Rubin's associates from the action or the Rule 11 sanction decision against Balestriere. Only the smear remains, echoing infinitely across the Web.

178      Plaintiff incurred some $300,000 in fees and costs in defending the Sham Action.

179      Beyond this amount, the damage to Plaintiff's reputation is monumental. Socially, Plaintiff is shunned by a number of people she used to know.  Plaintiff has been openly mocked for representing a misogynist.  People regularly ask her about her "dungeon," and about her sex life.  Plaintiff and her husband are no longer invited to holiday and other social gatherings.  Friends who had confided to her that they had been sexually abused in the past now ceased all contact with her.  Plaintiff's Chasidish/Yeshivish in-laws stopped visiting for almost a year, and Plaintiff and her husband were not invited to their home.

180      Previously, Plaintiff was routinely invited to work on or lead parent committees at her children's various schools and local charities.  Since the Sham Action, she has not been invited to participate in a single committee.  Plaintiff's children are frequently not invited on play dates, and many families will not allow their children to go to Plaintiff's home any more.

181     Plaintiff lives in constant fear of being "googled." She has a unique name and any search engine used on her name immediately pulls up the Sham Action. Plaintiff feels the need to defensively raise the subject with people in a vain attempt to preempt the negative effect of any Internet search or other disclosure of the Sham Action and its horrific allegations.

182     Former colleagues and judges whom Plaintiff had spent years building relationships have significantly distanced themselves from Plaintiff.

183     Shortly after the Sham Action's allegations became public, her longtime babysitter quit. Her house cleaning service refused to send anyone to her home.

184     Plaintiff used to lecture on legal and ethics topics at two local synagogues. Since the Sham Action neither has invited her to return to lecture.

185     Plaintiff had been invited by a sitting councilman to submit her resume for consideration as a candidate for the town council. Unsurprisingly, after the Sham Action, this opportunity disappeared.

186     As a result of the hostility Plaintiff faced from family and friends, and the fact that Plaintiff's unique name allowed her phone number and address to be found easily, made Plaintiff afraid both in and out of her home. In November 2017, just after the Sham Action was filed, Plaintiff installed an alarm system in her home. For several months after the filing of the Sham Action, Plaintiff was afraid to leave her home unaccompanied.

187     Most terrifying, after the filing of the Sham Action Plaintiff received at least two dozen calls from blocked numbers where the caller would either make strange noises or just hang up. These culminated on May 18, 2018, when Plaintiff answered a call in which there was a male voice on the line that stated Plaintiff is the attorney for Rubin. Plaintiff asked several times who the caller was. Eventually the caller replied "what the f$ckk does it matter" and then

repeated over and over "we are coming to pay you a visit," and "we are coming for you." Plaintiff, fearing for her life and the safety of her small children immediately reported the threat to the police.

188     A police investigation was initiated. Thereafter, a number of strange cars were seen lingering at various times on Plaintiff's quiet, residential street. Plaintiff lives in fear for her safety and the safety of her family.

189     As a result of the harassment, threats, and scorn to which the Sham Action and Saland's remarks have subjected her, Plaintiff has suffered insomnia, terrible anxiety (including a refusing to go outside unaccompanied for the first six months after the Sham Action was filed), and loss of consortium.  Her emotional health and her relationship with her husband have suffered tremendously.

190     Plaintiff's husband who has spent twenty-one years working in the finance industry, was mortified and confused when he read the allegations against Plaintiff and her clients in the complaint.  As an Orthodox Jew who grew up in a Chasidish/Yeshivish home, Plaintiff's husband was particularly repulsed by the graphic violent and sexual allegations of his wife.  This created substantial tension in their relationship.

191     Shortly after the Sham Action was filed, Plaintiff's husband was repeatedly questioned about the Sham Action by his superior. It had come to his employer's attention because of the involvement of Rubin, who is very well known in the financial industry. Thereafter, Plaintiff's husband was demoted and transferred to another office at significantly lower pay. Plaintiff's husband suffers from anxiety, his medical condition since the filing of this action has deteriorated significantly – resulting in higher medical expenses.

192     The Sham Action also had its intended effect on her professional life.  Colleagues stopped calling or referring business.  Plaintiff has lost numerous existing clients.  Plaintiff had been regular outside counsel for a New Jersey nursing home.  After the Sham Action, the client severed all communications with Plaintiff and would not return calls and emails.

193     Prior to the Sham Action, Plaintiff had been in discussions with a multi-billion-dollar company to take on a steady outside counsel role.  After the Sham Action, these talks ceased, and the opportunity for this continuous stream of high-pay employment disappeared.

194     With regard to the few matters Plaintiff has been able to obtain, her name is so tainted by the Sham Action that she has to act as co-counsel rather than lead counsel, and have only lead counsel sign papers.

195     In the one criminal matter Plaintiff has had in Kings County Supreme Court, since the Sham Action, the A.D.A.s in her old office treated her with open hostility and disdain.

196     Wholly apart from the reputational harm, Plaintiff was forced to spend the past year defending against these concocted RICO, sex trafficking and outrageous criminal allegations, leaving no ability to develop and grow Plaintiff's law practice.  Significantly, the false and damaging impression exists that Plaintiff is no longer permitted to practice law. This itself has obvious reverberating consequences.

197     When Plaintiff's insurance carrier discovered the Sham Action, Plaintiff's umbrella policy was cancelled because of an "unfavorable public document."

198     In today's world the first thing a client does is conduct an Internet search prior to hiring a new lawyer.  Those searches for Plaintiff quickly turn up the lurid allegations in the Sham Action, echoed throughout myriad stories in the media. This is exactly the revenge Defendant Balestriere sought.

199     The result has been the desolation of Plaintiff's current and future law practice, and the desolation of Plaintiff's current and future employment opportunities, and irreparable social and reputational harm.

**After Plaintiff Filed The State Lawsuit, Defendant Balestriere Defrauds the State Court in Order to Punish Plaintiff**

200     Plaintiff filed the State Lawsuit by summons and complaint dated October 31, 2018 in order to redress the horrific and irreversible harm done to her by Defendant Balestriere's tortious conduct against her.

201     Over the course of the State Lawsuit, Defendant Balestriere has sought to punish Schnur for having filed the State Lawsuit and has repeatedly filed false statements with the Court in an attempt to convince the State Court to acquiesce Defendant's punishment of Plaintiff for having filed the State Lawsuit. Indeed, when the parties were ordered to court-ordered ADR in this action, the Defendant Balestriere threated Schnur that if she did not withdraw this lawsuit, they would file a new action against her in retaliation.

*Defendant Balestriere Makes Misrepresentations in the Abuse of Process Action*

202     One year after Plaintiff filed the State Lawsuit seeking redress for the severe harm Balestriere and his State Lawsuit codefendants caused Plaintiff, on October 30, 2019, Defendant Balestriere made good on his threats **and filed a new action against both Plaintiffs**, her then counsel, John McFerrin-Clancy, and Howard Rubin, styled *Balestriere PLLC v. Howard Rubin*, Index No. 160593/2019 (Sup. Ct. N.Y. Co.) (the "Abuse of Process Action"), asserting claims for tortious interference and abuse of process for having filed this action (and, in Rubin's case, allegedly funding it).  The sole purpose of the meritless action was to punish Plaintiff and her counsel for having filed this action.  Even further highlighting the improper purpose of the Abuse of Process Action, on the day after it was filed, Balestriere Fariello caused an article to be written

on Law360 in which John Balestriere was quoted attacking Plaintiff for having dared to bring the

State Lawsuit.

a    As the State Court's decisions have shown, it was the Abuse of Process Action, not this action, that was wholly without merit. The State Court dismissed the Abuse of Process Action in its entirety because it was insufficient as a matter of law, and the Balestriere Defendants did not appeal that decision. (Abuse of Process Action Dkt. No. 46.) However, in addition to its utter lack of legal merit, the Balestriere Defendants' complaint in the Abuse of Process Action contained a clear misrepresentation of fact to the State Court, tantamount to a fraud on the State Court.

b    Specifically, Balestriere Fariello alleged that Plaintiffs' filing of this action caused its client, Rico, to drop out of the Sham Action. See Abuse of Process Action Cplt ¶¶ 22, 42-44. But Balestriere Fariello represented to the federal court **before this action was filed** that Rico was refusing to cooperate with the firm, and that the firm was therefore terminating her participation in that case. Specifically:

i    On October 2, 2018, Balestriere Fariello filed a letter in the federal district court stating that it intended to move to withdraw from representing Rico.

ii    On October 3, 2018, Balestriere Fariello filed a declaration in support of its motion to withdraw from representing Rico, averring that its relationship with Rico had irretrievably broken down no later than June 2018. The declaration also stated that the firm had decided in September 2018 to "fire" Rico as a client.

iii    The Schnur Action was filed on October 31, 2018. Plaintiff's allegation in the Abuse of Process Action Complaint that the filing of this action caused Plaintiff to lose Rico as a client is thus a blatant misrepresentation—there is no other way it can be characterized and it cannot be explained away.

c    Plaintiffs noted this clear misrepresentation to the State Court in their motion to dismiss (Abuse of Process Action Dkt. No. 26). But instead of withdrawing this false allegation, the Balestriere Defendants instead doubled down, arguing in opposition to the motion that a letter sent by Rubin to Rachel Thomas in January 2019—three months **after** this action was filed—somehow showed the filing of this action was responsible for Rico's withdrawal from the Sham Action in June 2018. (Abuse of Process Action Dkt. No 32.) Of course, this could not possibly be the case.

d The State Court, unmoved by both Balestriere's initial misrepresentation regarding the timing of Rico's withdrawal from the Sham Action and by its later argument regarding the January 2019 letter held that "the documentary evidence submitted by defendants conclusively establishes that Rico's abandonment of the Sham Action was tangential to the filing of" this action (Abuse of Process Action Dkt. No. 46.)

203 Finding Defendant Balestriere's claims in the Abuse of Process Action to be meritless, the State Court dismissed it on January 27, 2021.

*Defendant Balestriere Continues to Make Misrepresentations in the State Lawsuit*

204 The Balestriere Defendants' fraud on the Court did not end with the dismissal of their Abuse of Process action. Instead, their filings in the State Lawsuit have continued to include blatant misrepresentations and lies to the State Court.

a Defendant Balestriere's motion to dismiss in this action (Dkt. Nos. 63 – 77) was riddled with false statements to the Court. The table below summarizes Defendants' most egregiously false statements:

| Defendants' False Statement | Fact |
| --- | --- |
| The Rule 11 Sanction in the Sham Action is not final | The finding that Rule 11 was violated was final in the June 2018 order; the $20,000 amount of the sanction was final in the October 2018 order, as proven by the fact that John Balestriere sent Schnur a check in the amount of $20,000 on October 12, 2018 and filed Sham Action Docket No. 193. Indeed, in his October 2018 order sanctioning Balestriere in the amount of $20,000 (Exhibit 10), Judge Cogan held that "monetary sanctions are appropriate" and that "**they should be imposed now, rather than at the end of this case**," because Balestriere "**clearly has not gotten the message.**" Ex. 10 at 4 (emphases added). |

| Defendants' False Statement | Fact |
|---|---|
| The court in the Sham Action "reduced" the amount of the sanction | The court based the sanction on the amount needed to deter future sanctionable conduct[15] |
| Ms. Schnur admitted to reviewing the NDAs before the [EDNY Plaintiffs] signed them | Ms. Schnur was never shown the NDAs prior to any of the EDNY Plaintiffs signing them |
| Ms. Schnur worked for Rubin during "much of the time" he had encounters with the [EDNY Plaintiffs] | Ms. Schnur began working for Rubin in October 2016 after Rubin already had encounters with each and every one of the EDNY Plaintiffs. |
| Ms. Schnur never contested the allegations against her prior to the filing of the Sham Action | Ms. Schnur wrote to Balestriere on October 3, 2017, stating that the allegations in the draft complaint were false, and citing cases showing that the allegations as to her were also legally baseless and sanctionable |
| The lawyer defendants did not make false statements to the federal court in the Sham Action | The court ruled the action had no factual or legal basis as to Schnur, and the EDNY Plaintiffs repudiated the allegations concerning Schnur under oath |
| Ms. Schnur had repeated conversations with John Balestriere | Schnur had only two conversations with John Balestriere. One in which John Balestriere asked Schnur if she represented Rubin. The second during which John Balestriere called Schnur a "moron" who has "no idea what you're doing" |
| Schnur's motion to dismiss the Sham Action was granted before any discovery responses by the [EDNY Plaintiffs] were provided | The motion to dismiss was granted on April 29, 2018; the Original EDNY Plaintiffs' responses to requests to admit were served March 6, 2018. The remaining four Plaintiffs failed to respond to Schnur's Requests to Admit. |

b        Likewise, the Saland Parties (i.e., Defendant Balestriere's co-counsel in the Sham Action) made egregious affirmative misrepresentations concerning their involvement in the Sham Action, including:

---

[15] As is obvious from the instant table, the court severely underestimated Defendant Balestriere's proclivity to make misrepresentations in litigation.

| i | "Attorney Saland represented [Lytell] in defense of a criminal matter, not in regard to the [Sham] action against Plaintiff." (Dkt. No. 197 ¶ 3 n.2.) |
|---|---|
| ii | "Attorney Saland did not commence the [Sham] Action. Rather, his client was involved in the [Sham]Action under representation by a different attorney." (*Id.* ¶ 20.) |
| iii | "Nor is there any indication whatsoever that Attorney Saland was involved in drafting the allegations in the [Sham] Action. Even if he was, which is denied . . ." (*Id.* ¶ 22.) |
| **iv** | "Attorney Saland did not draft the EDNY Complaint." (*Id.* ¶ 23.) |

205    These were blatant and fraudulent misrepresentations made to the State Court. As show above, the truth was that Saland Parties not only represented the EDNY Plaintiffs but undertook a special form of representation under Rule 1.5(g) of the New York Rules of Professional Responsibility that imposed responsibility and liability for the acts of their co-counsel.

206    On January 29, 2021, the State Court granted in party and denied in part motions to dismiss.  Defendant Balestriere's motion to dismiss Plaintiffs claims for defamation and malicious prosecution was denied while the State Court granted Defendant Balestriere's motion to dismiss with respect to the claim for violation of Judicial Law Section 487 and Saland and Crotty Saland P.C.' (collectively "Saland Parties") motion to dismiss based on their affirmative misrepresentations concerning their involvement in the Sham Action. Specifically, this Court held: "[P]laintiffs have failed to allege facts sufficient to establish that the Saland defendants conspired with the Balestriere defendants to defame Schnur, or otherwise participated in the drafting of the federal complaint, such that the [fair reporting] privilege should not apply."

207    After the State Court granted in part and denied in part the motions to dismiss in the State Lawsuit, on April 22, 2021, the Balestriere Defendants submitted an answer in this action, which they then amended on April 26 (although the substance of the answer remained the

same). In this answer, Defendant Balestriere issued a blanket denial of nearly every single allegation, ranging from the innocuous to undisputed material facts, making multiple false statements of fact to the State Court in the process, including:

a   The Complaint initially describes the allegations in the Sham Action and references various new articles written about the Sham Action at the time it was filed.  (Compl. ¶¶ 3 – 7.)  In their answer, Defendant Balestiriere denies every single one of these allegations.  Presumably Defendant Balestriere does not intend to withdraw the Sham Action, and so their blanket denial of them is a misrepresentation to the Court.

b   Most egregiously, in Paragraph 13 of the Complaint, Plaintiffs alleged that Judge Cogan, who presides over the Sham Action, imposed $20,000 in Rule 11 sanctions against Defendant Balestriere.  In his answer, the Defendant Balestriere admits this, yet they falsely claim that the Court said "it would revisit whether to vacate the sanctions award at the end of the action."  **This is a lie**.  As discussed above, while Judge Cogan *initially*, at the hearing, indicated he may revisit the issue, Judge Cogan's finding that Defendant Balestriere violated Rule 11 was final as of the October 2018 order in which he firmly and clearly held that sanctions "**should be imposed now, rather than at the end of the case**," because Defendant Balestriere "**clearly has not gotten the message**."  (Ex. 10 at 4 (emphases added).)  Thus, the $20,000 amount of the sanction was final in the October 2018 order, as further proven by the fact that John Balestriere sent Schnur a check in the amount of $20,000 on October 12, 2018 and filed Federal Action Docket No. 193.  That Defendant Balestriere continues to deny this fact after being reprimanded by Judge Cogan shows that even now, they still "ha[ve] not gotten the message" that their harassment and defamation of Ms. Schnur will not stop until they are made to account for it through this action.

c   Defendant Balestriere falsely denies the allegations in Paragraphs 15 - 20 of the Complaint they are each attorneys practicing through Balestriere Fariello and/or Balestriere LLC and that they participated in the Sham Action in various ways.  Their refusal to admit even the most routine of facts makes clear the bad faith nature of the Balestriere Defendants' conduct in this action.

208   Plaintiffs also appealed the State Court's order granting the Saland Parties' motion to dismiss. The Saland Parties in opposition again made knowingly false statements to the First Department, including:

| a | "Attorney Saland's client was involved in the [Sham] Action under representation by a different attorney.") |
|---|---|
| b | "Nor is there any indication whatsoever that Attorney Saland was involved in drafting the allegations in the [Sham] Action. Even if he was, which is denied . . ." |
| c | "Attorney Saland was not attorney of record in the [Sham] Action." |
| d | "Attorney Saland did not draft the [Sham] Complaint" |

209    On September 27, 2022, the First Department affirmed the State Court's motion to dismiss order, in part, insofar as it granted Saland Parties' motion in its entirety. Specifically, as to the defamation claim against the Saland Parties, the First Department held the sham exception to the fair report privilege did not apply because "there is no evidence or allegations that the reporter (Saland) participated in drafting the sham complaint."

210    The First Department also reinstated Plaintiffs' claim for violation of Judicial Law Section 487.

211    On March 21, 2023, Plaintiffs received for the first time, only after Plaintiffs brought a motion to compel and almost five years after the State Lawsuit was filed, a production of documents that showed that Saland was referred to as "co-counsel," actively participated in the representation of the three original plaintiffs in the Sham Action, and drafted and edited the false allegations about Schnur.

212    The production also included an invoice with time entries for Balestriere Fariello and Saland from August 16, 2017 through November 2, 2017 (the "Produced Time Entries"). The Produced Time Entries purport to be in the form of an invoice dated December 5, 2017 and sent via email to Mia Lytell. The Produced Time Entries included only four entries for Saland, all of which delt with client meetings. A true and complete copy of the Produced Time Entries is annexed hereto as Exhibit 11. Though Plaintiffs did not know at the time, numerous time entries

showing Saland's involvement in the Federal Action were deceptively omitted from the Produced Time Entries and further showed that Defendant Balestriere was acting in concert with Saland to defraud the State Court concerning Saland's involvement in the case.

213     Based on the newly discovered emails, Plaintiffs moved on April 10, 2023, to reinstate the defamation and malicious prosecution claims against the Saland Parties. On August 31, 2023, this Court reinstated the complaint against Saland Parties.

214     On May 2, 2024, Balestriere Fariello filed a motion for attorney's fees and reimbursement ("Fee Application") in the Sham Action. As part of the Fee Application, Balestriere Fariello submitted time entries for the work it purportedly completed in the Sham Action (the "Fee Application Time Entries"). The Fee Application Time Entries include an additional twenty-six entries for Saland between August 16, 2017, and November 2, 2017, that were omitted from the Produced Time Entries. A true and complete copy of the Fee Application Time Entries is annexed hereto as Exhibit 12.

215     These omitted entries show that Saland "edit[ed] [the] draft complaint," regularly communicated with Balestriere Defendants concerning the Sham Action and worked on the press release. These additional twenty-six entries, though clearly relevant, were never produced in the State Lawsuit action. A true and complete copy of a chart comparing Jeremy Saland's time entries in the Fee Application Time Entries against the Produced Time Entries is annexed hereto as Exhibit 13.

216     What's striking is, not just that twenty-six time entries were omitted from the Produced Time Entries, but that the four Produced Time Entries for Saland are limited to client meetings and give the false impression that Saland was nothing more than an initial client liaison. Indeed, the entry for September 19, 2017 is particularly striking because while the Fee

Application Time Entries stated "Flight to Ft. Lauderdale; discuss updates and next steps with JGB" the Produced Time Entries for same date omits any reference to the discussion with Defendant Balestriere. Selectively omitting evidence in this manner evidences a deliberate intention to further deceive Plaintiffs and the State Court as to Saland's true involvement in the case.

217     Upon information and belief, Defendant Balestriere not only silently withheld these time entries but created a falsified invoice to conceal Saland's involvement in the case.

218     Indeed, in a letter dated August 5, 2024, Plaintiffs' confronted Defendant Balestriere with the discrepancies in Saland's entries between the Fee Application Time Entries and the Produced Time Entries. In the letter, Plaintiffs' counsel explained that the omission of these critical time entries from Produced Time Entries, which purport to be an invoice dated December 5, 2017, raised a very strong inference that the Produced Time Entries were a falsified document intentionally created by Defendant Balestriere for the purposes of perpetuating a fraud on the Court concerning Saland Parties involvement in this Sham Action. Plaintiff's counsel further requested that Defendant Balestriere provide a native copy of the Produced Time Entries with metadata showing its date of creation. A true and complete copy of the August 5, 2024 letter from Plaintiffs' counsel is annexed hereto as Exhibit 14.

219     In response, in a letter dated August 14, 2024, Defendant Balestriere claimed that the "invoice was generated on December 5, 2017, and reviewed on December 7, 2017 by the chief attorney John Balestriere" but did not include any native documents to support this claim. A true and complete copy of the August 14, 2024 letter from Defendant Balestriere is annexed hereto as Exhibit 15.

220     When, in response, Plaintiffs' counsel insisted that Defendant Balestriere provide a native copy of the invoice with date modified metadata, Defendant Balestriere on October 11, 2024 responded he did "not have this native document within [his] custody or control." Defendant Balestriere further stated that:

> **In 2017, the law firm Balestriere Fariello was using a timekeeping and case management system called "Time Matters."** Balestriere Fariello suspended use of that program years ago. Balestriere Fariello has since used a different time keeping and case management system. **If an invoice was generated when used Time Matters, Balestriere Fariello no longer has a copy of that invoice.**

A true and complete copy of the October 11, 2024 letter from Defendant Balestriere is annexed hereto as Exhibit 16.

221     But Defendant Balestriere's claim that his firm has no invoices from 2017 flatly contradicts his unsubstantiated assertion that the invoice shown in Produced Time Entries was "generated on December 5, 2017, and reviewed on December 7, 2017."

222     On information and belief, the truth is that the invoice shown in the Produced Time Entries was not generated on December 5, 2017. Instead, it is falsified evidence that Defendant Balestriere intentionally created to perpetuate his fraud on the State Court. And despite being provided with an opportunity to correct these blatantly falsified records, to date he has refused to do so.

223     Moreover, Defendant Balestriere further concealed Saland's involvement by improperly withholding retainer and a fee splitting agreements that showed Saland had assumed joint responsibility for the representation in return for a portion of any contingency fee award.

224     Even though Plaintiffs had repeatedly demanded that Defendant Balestriere produce his retainer agreements with the EDNY Plaintiffs, he failed to do until after Amended EDNY Plaintiff Natasha Tagai shared a copy of her retainer agreement during her deposition on May 10, 2024.

225     Tagai's retainer agreement showed, in total contradiction to Saland Parties' representations and Defendant Balestriere's efforts to conceal Saland Parties' involvement, that Saland Parties and Defendant Balestriere entered into arrangement pursuant to Rule 1.5(g) of the New York Rules of Professional Responsibility whereby each agreed to assume joint responsibility for representation of the EDNY Plaintiffs in the Sham Action.

226     Only after Tagai disclosed her retainer agreement and thus disclosing to Plaintiffs for the first time the contractual underpinnings of Saland's involvement in the Sham Action, did Defendant Balestriere produce retainer agreements with the EDNY Plaintiffs and his fee splitting agreement with Saland.

227     Thus, as shown above, despite being sanctioned in the Sham Action, Defendant Balestriere continues undeterred in repeatedly submitting false statements of fact to the State Court, and has continued to perpetuate frauds on the State Court.  Just as Judge Cogan held, they clearly "ha[ve] not gotten the message," and will not until they are held to account for their harassment and defamation of Plaintiff.

228     It should also be noted that, of all of the individual Balestriere lawyers who participated in the Sham Action, only Defendant Balestriere remains at the firm. This is further circumstantial evidence that for many of the Balestriere lawyers, being constantly required to file false statements with various courts was untenable and led to their leaving the firm.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Defamation Against Defendant Balestriere – 11 U.S.C. § 523(a)(6))

229     Plaintiff repeats and realleges the allegations set forth above as if each were fully set forth herein.

230     The statements described above made in the complaint, RICO statement, amended complaint, amended RICO statement, second amended complaint and statements to the press

concerning those documents are completely false. The Sham Action was a sham, without basis in fact or law and these Defendants sought only to use the form of an action to shield their libel.

231     In addition, as set forth above, those false statements accuse Plaintiff of crimes, and of unethical conduct, and are thus libelous *per se*.

232     Defendant Balestriere was aware of these statements and knew them to be false when made.

233     While Defendant Balestriere put his names on the papers, they acted in concert with and as agents for the Original EDNY Plaintiffs, who authorized and encouraged the filing of the libelous statements.

234     Upon information and belief, Defendant Balestriere provided the complaint in the Sham Action to the New York Post for publication prior to its being publicly available.

235     The libelous statements were republished in the New York Post, in the articles referenced above and, upon information and belief, in other media and articles. This was the intention of these defendants all along.

236     The purpose for making these statements was actual malice, to injure Plaintiff.

237     Plaintiff has been injured in her reputation and in her business, through loss of existing and potential clients.

238     For these reasons, Defendant Balestriere is liable to Plaintiff for libel in an amount to be determined at trial, but in any event not less than $50,000,000.

239     Furthermore, Defendant Balestriere's actions constitute willful and malicious injury to Plaintiffs. Accordingly, the debt arising from these claims should not be discharged pursuant to 11 U.S.C. § 523(a)(6).

## AS AND FOR A SECOND CAUSE OF ACTION
(Malicious Prosecution Against Defendant Balestriere – 11 U.S.C. § 523(a)(6))

240    Plaintiff repeats and realleges each of the allegations above as if each were set forth fully herein.

241    The Sham Action, including both of its amendments, had no good faith basis in fact or law.  Defendant Balestriere knew it had no basis before and at the time of each and every filing.  Defendant Balestriere brought the Sham Action out of actual malice toward Plaintiff.  Defendant Balestriere was furious at Plaintiff for impeding a settlement with Rubin that Defendant Balestriere thought would net an easy payday.  Defendant Balestriere included Plaintiff in the Sham Action solely for the purpose of punishing Plaintiff by permanently destroying Plaintiff's reputation, causing her to incur costs and fees in defense and inflicting grievous emotional harm upon Plaintiff.

242    While Defendant Balestriere actually filed the Sham Action, he did so with the consent, authorization and encouragement of the Original EDNY Plaintiffs.

243    For these reasons, Defendant Balestriere is liable to Plaintiff for malicious prosecution in an amount to be determined at trial, but in any event not less than $50,000,000.

244    Furthermore, Defendant Balestriere's actions constitute willful and malicious injury to Plaintiffs.  Accordingly, the debt arising from these claims should not be discharged pursuant to 11 U.S.C. § 523(a)(6).

## AS AND FOR A THIRD CAUSE OF ACTION
(Judiciary Law Sec. 487 Against Defendant Balestriere– 11 U.S.C. § 523(a)(6))

245    Plaintiff repeats and realleges each of the allegations above as if each were set forth fully herein.

246    In bringing, amending and maintaining the Sham Action, Defendant Balestriere intentionally deceived Judge Cogan with regard to the good faith basis for the allegations therein.

247     Defendant Balestriere actually filed the Sham Action. Upon information and belief, Defendant Balestriere did this with the knowledge that the statements in the Sham Action were false.

248     Indeed, the discovery responses provided by Defendant Balestriere's firm in the Sham Action proved the case was meritless.  Upon information and belief, Defendant Balestriere or his associates and partners attended every deposition in the Sham Action, including of the EDNY Plaintiffs.  Defendant Balestriere therefore learned that the allegations complained of herein were false.  Moreover, upon information and belief, Defendant Balestriere or his associates and partners also participated in interviews and preparation sessions with the Original EDNY Plaintiffs (and eventually the Amended EDNY Plaintiffs), before and after the commencement of the Sham Action.  Upon information and belief, Defendant Balestriere learned of the absence of any good faith factual basis for the allegations in those interviews and sessions.

249     Despite this knowledge, all of these defendants continued to deceive the court in the Sham Action as to the lack of merit of the allegations as to Plaintiff.

250     For these reasons, Defendant Balestriere is liable to Plaintiffs for violation of Judiciary Law Sec. 487 in an amount to be determined at trial, but in any event not less than $50,000,000.

251     Defendant Balestriere's actions constitute willful and malicious injury to Plaintiffs.  Accordingly, the debt should not be discharged pursuant to 11 U.S.C. § 523(a)(6).

## AS AND FOR A FOURTH CAUSE OF ACTION
(Judiciary Law Sec. 487 Against Defendant Balestriere for his conduct after the filing of the Complaint in the State Lawsuit – 11 U.S.C. § 523(a)(6))

252     Plaintiff repeats and realleges each of the allegations above as if each were set forth fully herein.

253     Since the filing of this action, the Defendant Balestriere has made repeated, intentionally false statements of fact to this Court.

254     As described in paragraphs 200 – 228, and the subparts thereto, nearly every filing that the Balestriere Defendants have made in this action, whether as parties or, prior to their disqualification, as counsel to the EDNY Plaintiffs, have been filled with demonstrably false statements, tantamount to a fraud on the Court.

255     Plaintiffs have repeatedly pointed out these false statements, yet the Balestriere Defendants continue to make them, evincing that these statements are made intentionally to deceive the Court.

256     Defendant Balestriere, in concert with Jeremy Saland, has also perpetrated a fraud on the State Court by withholding and falsifying critical evidence in an effort to conceal the nature of Jeremy Saland's involvement in the Sham Action.

257     For these reasons, Defendant Balestriere is liable to Plaintiffs for violation of Judiciary Law Sec. 487 in an amount to be determined at trial, including treble damages as set forth in Section 487, but in any event not less than $50,000,000.

258     Furthermore, Defendant Balestriere's actions constitute willful and malicious injury to Plaintiffs. Accordingly, the debt arising from these claims should not be discharged pursuant to 11 U.S.C. § 523(a)(6).

### AS AND FOR A FIFTH CAUSE OF ACTION
(Slander Against Defendant Balestriere for
Slander by Saland and Crotty Saland P.C. – 11 U.S.C. § 523(a)(6))

259     Plaintiff repeats and realleges the allegations set forth above as if each were fully set forth herein.

260     As set forth above, Saland stated to the New York Post that Plaintiff had attempted to contact Lytell, and that Plaintiff violated her ethical obligation in attempting to take

over the representation.  These statements are false and Saland knew they were false when he made them.

261     Saland made the above statements with actual malice, in order to harm Plaintiff and her reputation.  Saland was attempting to support the Sham Action he had helped put together to injure Plaintiff.

262     To the extent Saland was commenting on the Sham Action, the action was a sham, without basis in fact or law and was published in the form of a complaint only to use the existence of a lawsuit as a shield for the defamatory statements.

263     The statements of unethical conduct aimed at a lawyer are slanderous per se, and have harmed Plaintiff's reputation and her business, through loss of current and future clients.

264     Saland made these statements in the course of his representation of Lytell and the EDNY Plaintiffs in the Sham Action.  Therefore, Crotty Saland P.C. is liable for his tortious conduct.

265     In accordance with Rule 1.5(g) of the New York Rules of Professional Responsibility, Defendant Balestriere assumed joint responsibility and liability for the tortious acts of Saland and Crotty Saland P.C. that arose in the course of their representation of Lytell and the EDNY Plaintiffs in the Sham Action. Therefore, Defendant Balestriere is liable for the tortious conduct of Saland and Crotty Saland P.C in connection with that representation.

266     Defendant Balestriere's and Saland's joint assumption of responsibility for the representation of the EDNY Plaintiffs in the Sham Action is the equivalent of a partnership. Because Saland and Crotty Saland P.C. actions were undertaken for the benefit of their partnership-like arrangement and thus for the benefit of Defendant Balestriere, the willful and malicious acts of Saland and Crotty Saland P.C. are imputed to Defendant Balestriere.

267     Moreover, Defendant Balestriere conspired and acted in concert with Saland and Crotty Saland P.C. to intentionally and maliciously harm Plaintiff through their tortious conduct.

268     For these reasons, Defendant Balestriere is liable to Plaintiffs for the slander of Saland and Crotty Saland P.C. in an amount to be determined at trial, but in any event not less than $50,000,000.

269     Furthermore, Defendant Balestriere's actions constitute willful and malicious injury to Plaintiffs.  Accordingly, the debt arising from these claims should not be discharged pursuant to 11 U.S.C. § 523(a)(6).

### AS AND FOR A SIXTH CAUSE OF ACTION
(Defamation Against Defendant Balestriere for
Defamation by Saland and Crotty Saland P.C. – 11 U.S.C. § 523(a)(6))

270     Plaintiff repeats and realleges the allegations set forth above as if each were fully set forth herein.

271     As set forth above, Saland was Balestriere's co-counsel in representing the three Original EDNY Plaintiffs and drafted many of the false allegations against Schnur that were included in the complaint in the Sham Action.

272     On November 3, 2017, following the filing of the Federal Action, Saland wrote in a statement to New York Post reporter Rebecca Rosenberg that "Defendant Schnur for the benefit of and to protect Mr. Rubin, contacted my client in an attempt to silence her, pay her monies, and have her sign an agreement," and that "[b]ut for my call and text to Defendant Schnur to refrain from any direct or third party contact with my client, Defendant Schnur could have succeeded in taking advantage of a vulnerable person."

273     Saland's statement to the New York Post that Plaintiff had attempted to contact Lytell, and that Plaintiff violated her ethical obligation in attempting to take over the representation are false and Saland knew they were false when he made them.

274     Saland made the above statements with actual malice, in order to harm Plaintiff and her reputation.  Saland was attempting to support the Sham Action he had drafted on behalf of his clients, the Original Filing Defendants, to injure Plaintiff.

275     Because of Saland's representation of the Original EDNY Plaintiffs, and the fact that Saland drafted many of the false statements against Schnur included in the complaint in the Sham Action, Saland's false and defamatory statements to the press about. Schnur cannot be protected by the Fair Reporting Privilege (Civil Rights Law §74).  Specifically, Saland cannot claim to have been merely commenting on allegations in a publicly filed complaint because he was the individual who drafted those very allegations, which were false when made and which he knew were false when made.

276     To the extent Saland was commenting on the Sham Action, the action was a sham, without basis in fact or law and was published in the form of a complaint only to use the existence of a lawsuit as a shield for the defamatory statements.  Saland, as attorney for the Original  EDNY Plaintiffs who drafted the very allegations in the Sham Action complaint upon which he provided comment to the press, knew this fact when he made his defamatory statements to the press.

277     The statements of unethical conduct aimed at a lawyer are defamation per se, and have harmed Plaintiff's reputation and her business, through loss of current and future clients.

278     Saland made these statements in the course of his representation of Lytell and the other Original EDNY Plaintiffs, in his role as a member of Crotty Saland P.C.  Therefore, Crotty Saland P.C. is liable for his tortious conduct.

279     In accordance with Rule 1.5(g) of the New York Rules of Professional Responsibility, Defendant Balestriere assumed joint responsibility and liability for the tortious acts of Saland and Crotty Saland P.C. that arose in the course of their representation of Lytell and the EDNY Plaintiffs in the Sham Action. Therefore, Defendant Balestriere is liable for the tortious conduct of Saland and Crotty Saland P.C in connection with that representation.

280     Defendant Balestriere and Saland's joint assumption of responsibility for the representation of the EDNY Plaintiffs in the Sham Action is the equivalent of a partnership. Because the defamatory actions of Saland and Crotty Saland P.C. were undertaken for the benefit of their partnership-like arrangement with Defendant Balestriere and thus for the benefit of Defendant Balestriere, the willful and malicious acts of Saland and Crotty Saland P.C. are imputed to Defendant Balestriere.

281     Moreover, Defendant Balestriere conspired and acted in concert with Saland and Crotty Saland P.C. to intentionally and maliciously harm Plaintiff through their tortious conduct.

282     For these reasons, Defendant Balestriere is liable to Plaintiffs for the defamation of Saland and Crotty Saland P.C. in an amount to be determined at trial, but in any event not less than $50,000,000.

283     Furthermore, Defendant Balestriere's actions constitute willful and malicious injury to Plaintiffs.  Accordingly, the debt arising from these claims should not be discharged pursuant to 11 U.S.C. § 523(a)(6).

### AS AND FOR A SEVENTH CAUSE OF ACTION
(Punitive Damages Against Defendant Balestriere – 11 U.S.C. § 523(a)(6))

284     Plaintiff repeats and realleges the allegations above as if each were set forth fully herein.

285     The conduct of Defendant Balestriere described herein was malicious and shocking.  Further, the conduct focused on the abuse of the Courts, and thus was aimed at the public.

286     For these reasons, Defendant Balestriere is liable to Plaintiffs for punitive damages on all causes of action, in an amount to be determined at trial, but in any event not less than $50,000,000.

287     Furthermore, Defendant Balestriere's actions constitute willful and malicious injury to Plaintiffs.  Accordingly, the debt arising from these claims should not be discharged pursuant to 11 U.S.C. § 523(a)(6).

## AS AND FOR A EIGHTH CAUSE OF ACTION
(Defamation Against Defendant Balestriere – 11 U.S.C. § 523(a)(4))

288     Plaintiff repeats and realleges the allegations set forth above as if each were fully set forth herein.

289     The statements described above made in the complaint, RICO statement, amended complaint, amended RICO statement, second amended complaint and statements to the press concerning those documents are completely false.  The Sham Action was a sham, without basis in fact or law and these Defendants sought only to use the form of an action to shield their libel.

290     In addition, as set forth above, those false statements accuse Plaintiff of crimes, and of unethical conduct, and are thus libelous *per se*.

291     Defendant Balestriere was aware of these statements and knew them to be false when made.

292     While Defendant Balestriere put his names on the papers, they acted in concert with and as agents for the Original EDNY Plaintiffs, who authorized and encouraged the filing of the libelous statements.

293     Upon information and belief, Defendant Balestriere provided the complaint in the Sham Action to the New York Post for publication prior to its being publicly available.

294     The libelous statements were republished in the New York Post, in the articles referenced above and, upon information and belief, in other media and articles.  This was the intention of Defendant Balestriere all along.

295     The purpose for making these statements was actual malice, to injure Plaintiff.

296     Plaintiff has been injured in her reputation and in her business, through loss of existing and potential clients.

297     For these reasons, Defendant Balestriere is liable to Plaintiff for libel in an amount to be determined at trial, but in any event not less than $50,000,000.

298     Defendant Balestriere's actions arose in the context of his representation of the EDNY Plaintiffs. As counsel to the EDNY Plaintiffs, Defendant Balestriere was acting in a fiduciary capacity.

299     In the course of representing the EDNY Plaintiffs and while acting in a fiduciary capacity and in furtherance of the misconduct alleged in this complaint, Defendant Balestriere committed fraud on the court in the Sham Action by intentionally misrepresenting Plaintiff's actions or purported role in the conspiracy alleged in the Sham Action.

300     Thus, debt arising from these claims is from fraud while acting in a fiduciary capacity. Accordingly, the debt should not be discharged pursuant to 11 U.S.C. § 523(a)(4).

## AS AND FOR A NINTH CAUSE OF ACTION
(Malicious Prosecution Against Defendant Balestriere – 11 U.S.C. § 523(a)(4))

301     Plaintiff repeats and realleges each of the allegations above as if each were set forth fully herein.

302     The Sham Action, including both of its amendments, had no good faith basis in fact or law.  Defendant Balestriere knew he had no basis before and at the time of each and every filing.  Defendant Balestriere brought the Sham Action out of actual malice toward Plaintiff. Defendant Balestriere was furious at Plaintiff for impeding a settlement with Rubin that Defendant Balestriere thought would net an easy payday.  Defendant Balestriere included Plaintiff in the Sham Action solely for the purpose of punishing Plaintiff by permanently destroying Plaintiff's reputation, causing her to incur costs and fees in defense and inflicting grievous emotional harm upon Plaintiff.

303     While Defendant Balestriere actually filed the Sham Action, he did so with the consent, authorization and encouragement of the Original EDNY Plaintiffs.

304     For these reasons, Defendant Balestriere is liable to Plaintiff for malicious prosecution in an amount to be determined at trial, but in any event not less than $50,000,000.

305     Defendant Balestriere's actions arose in the context of his representation of the EDNY Plaintiffs. As counsel to the EDNY Plaintiffs, Defendant Balestriere was acting in a fiduciary capacity.

306     In the course of representing the EDNY Plaintiffs and while acting in a fiduciary capacity and in furtherance of the misconduct alleged in this complaint, Defendant Balestriere committed fraud on the court in the Sham Action by intentionally misrepresenting Plaintiff's actions or purported role in the conspiracy alleged in the Sham Action.

307     Thus, debt arising from these claims is from fraud while acting in a fiduciary capacity. Accordingly, the debt should not be discharged pursuant to 11 U.S.C. § 523(a)(4).

## AS AND FOR A TENTH CAUSE OF ACTION
### (Judiciary Law Sec. 487 Against Defendant Balestriere – 11 U.S.C. § 523(a)(4))

308     Plaintiff repeats and realleges each of the allegations above as if each were set forth fully herein.

309     In bringing, amending and maintaining the Sham Action, Defendant Balestriere intentionally deceived Judge Cogan with regard to the good faith basis for the allegations therein.

310     Defendant Balestriere actually filed the Sham Action. Upon information and belief, Defendant Balestriere did this with the knowledge that the statements in the Sham Action were false.

311     Indeed, the discovery responses provided by Defendant Balestriere's firm in the Sham Action proved the case was meritless.  Upon information and belief, Defendant Balestriere or his associates and partners attended every deposition in the Sham Action, including of the EDNY Plaintiffs.  Defendant Balestriere therefore learned that the allegations complained of herein were false.  Moreover, upon information and belief, Defendant Balestriere or his associates and partners also participated in interviews and preparation sessions with the Original EDNY Plaintiffs (and eventually the Amended EDNY Plaintiffs), before and after the commencement of the Sham Action.  Upon information and belief, Defendant Balestriere learned of the absence of any good faith factual basis for the allegations in those interviews and sessions.

312     Despite this knowledge, Defendant Balestriere continued to deceive the court in the Sham Action as to the lack of merit of the allegations as to Plaintiff.

313     For these reasons, Defendant Balestriere is liable to Plaintiffs for violation of Judiciary Law Sec. 487 in an amount to be determined at trial, but in any event not less than $50,000,000.

314    Defendant Balestriere's actions arose in the context of his representation of the EDNY Plaintiffs. As counsel to the EDNY Plaintiffs, Defendant Balestriere was acting in a fiduciary capacity.

315    In the course of representing the EDNY Plaintiffs and while acting in a fiduciary capacity and in furtherance of the misconduct alleged in this complaint, Defendant Balestriere committed fraud on the court in the Sham Action by intentionally misrepresenting Plaintiff's actions or purported role in the conspiracy alleged in the Sham Action.

316    Thus, debt arising from these claims is from fraud while acting in a fiduciary capacity. Accordingly, the debt should not be discharged pursuant to 11 U.S.C. § 523(a)(4).

## AS AND FOR A ELEVENTH CAUSE OF ACTION
(Slander Against Defendant Balestriere for
Slander by Saland and Crotty Saland P.C. – 11 U.S.C. § 523(a)(4))

317    Plaintiff repeats and realleges the allegations set forth above as if each were fully set forth herein.

318    As set forth above, Saland stated to the New York Post that Plaintiff had attempted to contact Lytell, and that Plaintiff violated her ethical obligation in attempting to take over the representation.  These statements are false and Saland knew they were false when he made them.

319    Saland made the above statements with actual malice, in order to harm Plaintiff and her reputation.  Saland was attempting to support the Sham Action he had helped put together to injure Plaintiff.

320    To the extent Saland was commenting on the Sham Action, the action was a sham, without basis in fact or law and was published in the form of a complaint only to use the existence of a lawsuit as a shield for the defamatory statements.

321     The statements of unethical conduct aimed at a lawyer are slanderous per se, and have harmed Plaintiff's reputation and her business, through loss of current and future clients.

322     Saland made these statements in the course of his representation of Lytell and the EDNY Plaintiffs in the Sham Action. Therefore, Crotty Saland P.C. is liable for his tortious conduct.

323     In accordance with Rule 1.5(g) of the New York Rules of Professional Responsibility, Defendant Balestriere assumed joint responsibility and liability for the tortious acts of Saland and Crotty Saland P.C. that arose in the course of their representation of Lytell and the EDNY Plaintiffs in the Sham Action. Therefore, Defendant Balestriere is liable for the tortious conduct of Saland and Crotty Saland P.C in connection with that representation.

324     Defendant Balestriere and Saland's joint assumption of responsibility for the representation of the EDNY Plaintiffs in the Sham Action is the equivalent of a partnership. Because Saland and Crotty Saland P.C. actions were undertaken for the benefit of their partnership-like arrangement and thus for the benefit of Defendant Balestriere, the fraudulent acts of Saland and Crotty Saland P.C. are imputed to Defendant Balestriere.

325     Moreover, Defendant Balestriere conspired and acted in concert with Saland and Crotty Saland P.C. to defraud the court in the Sham Action through their tortious conduct.

326     For these reasons, Defendant Balestriere is liable to Plaintiffs for the slander of Saland and Crotty Saland P.C. in an amount to be determined at trial, but in any event not less than $50,000,000.

327     Defendant Balestriere's and Saland's actions arose in the context of their joint representation of the EDNY Plaintiffs. As counsel to the EDNY Plaintiffs, Defendant Balestriere and Saland were acting in a fiduciary capacity.

328     In the course of representing the EDNY Plaintiffs and while acting in a fiduciary capacity and in furtherance of the misconduct alleged in this complaint, Defendant Balestriere and Saland committed fraud on the court in the Sham Action by intentionally misrepresenting Plaintiff's actions or purported role in the conspiracy alleged in the Sham Action.

329     Thus, debt arising from these claims is from fraud while acting in a fiduciary capacity. Accordingly, the debt should not be discharged pursuant to 11 U.S.C. § 523(a)(4).

## AS AND FOR A TWELFTH CAUSE OF ACTION
(Defamation Against Defendant Balestriere for
Defamation by Saland and Crotty Saland P.C. – 11 U.S.C. § 523(a)(4))

330     Plaintiff repeats and realleges the allegations set forth above as if each were fully set forth herein.

331     As set forth above, Saland was Balestriere's co-counsel in representing the three Original EDNY Plaintiffs and drafted many of the false allegations against Schnur that were included in the complaint in the Sham Action.

332     On November 3, 2017, following the filing of the Federal Action, Saland wrote in a statement to New York Post reporter Rebecca Rosenberg that "Defendant Schnur for the benefit of and to protect Mr. Rubin, contacted my client in an attempt to silence her, pay her monies, and have her sign an agreement," and that "[b]ut for my call and text to Defendant Schnur to refrain from any direct or third party contact with my client, Defendant Schnur could have succeeded in taking advantage of a vulnerable person."

333     Saland's statement to the New York Post that Plaintiff had attempted to contact Lytell, and that Plaintiff violated her ethical obligation in attempting to take over the representation are false and Saland knew they were false when he made them.

334     Saland made the above statements with actual malice, in order to harm Plaintiff and her reputation.  Saland was attempting to support the Sham Action he had drafted on behalf of his clients, the Original Filing Defendants, to injure Plaintiff.

335     Because of Saland's representation of the Original EDNY Plaintiffs, and the fact that Saland drafted many of the false statements against Schnur included in the complaint in the Sham Action, Saland's false and defamatory statements to the press about. Schnur cannot be protected by the Fair Reporting Privilege (Civil Rights Law §74).  Specifically, Saland cannot claim to have been merely commenting on allegations in a publicly filed complaint because he was the individual who drafted those very allegations, which were false when made and which he knew were false when made.

336     To the extent Saland was commenting on the Sham Action, the action was a sham, without basis in fact or law and was published in the form of a complaint only to use the existence of a lawsuit as a shield for the defamatory statements.  Saland, as attorney for the Original  EDNY Plaintiffs who drafted the very allegations in the Sham Action complaint upon which he provided comment to the press, knew this fact when he made his defamatory statements to the press.

337     The statements of unethical conduct aimed at a lawyer are defamation per se, and have harmed Plaintiff's reputation and her business, through loss of current and future clients.

338     Saland made these statements in the course of his representation of Lytell and the other Original EDNY Plaintiffs, in his role as a member of Crotty Saland P.C.  Therefore, Crotty Saland P.C. is liable for his tortious conduct.

339     In accordance with Rule 1.5(g) of the New York Rules of Professional Responsibility, Defendant Balestriere assumed joint responsibility and liability for the tortious

acts of Saland and Crotty Saland P.C. that arose in the course of their representation of Lytell and the EDNY Plaintiffs in the Sham Action. Therefore, Defendant Balestriere is liable for the tortious conduct of Saland and Crotty Saland P.C in connection with that representation.

340     Defendant Balestriere and Saland's joint assumption of responsibility for the representation of the EDNY Plaintiffs in the Sham Action is the equivalent of a partnership. Because the defamatory actions of Saland and Crotty Saland P.C. were undertaken for the benefit of their partnership-like arrangement with Defendant Balestriere and thus for the benefit of Defendant Balestriere, the fraudulent acts of Saland and Crotty Saland P.C. are imputed to Defendant Balestriere.

341     Moreover, Defendant Balestriere conspired and acted in concert with Saland and Crotty Saland P.C. to defraud the court in the Sham Action through their tortious conduct.

342     For these reasons, Defendant Balestriere is liable to Plaintiffs for the defamation of Saland and Crotty Saland P.C. in an amount to be determined at trial, but in any event not less than $50,000,000.

343     Defendant Balestriere's and Saland's actions arose in the context of their joint representation of the EDNY Plaintiffs. As counsel to the EDNY Plaintiffs, Defendant Balestriere and Saland were acting in a fiduciary capacity.

344     In the course of representing the EDNY Plaintiffs and while acting in a fiduciary capacity and in furtherance of the misconduct alleged in this complaint, Defendant Balestriere and Saland committed fraud on the court in the Sham Action by intentionally misrepresenting Plaintiff's actions or purported role in the conspiracy alleged in the Sham Action.

345     Thus, debt arising from these claims is from fraud while acting in a fiduciary capacity. Accordingly, the debt should not be discharged pursuant to 11 U.S.C. § 523(a)(4).

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Punitive Damages Against Defendant Balestriere – 11 U.S.C. § 523(a)(4))

346     Plaintiff repeats and realleges the allegations above as if each were set forth fully herein.

347     The conduct of Defendant Balestriere described herein was malicious and shocking.  Further, the conduct focused on the abuse of the Courts, and thus was aimed at the public.

348     For these reasons, Defendant Balestriere is liable to Plaintiffs for punitive damages on all causes of action, in an amount to be determined at trial, but in any event not less than $50,000,000.

349     Defendant Balestriere's actions arose in the context of his representation of the EDNY Plaintiffs. As counsel to the EDNY Plaintiffs, Defendant Balestriere was acting in a fiduciary capacity.

350     In the course of representing the EDNY Plaintiffs and while acting in a fiduciary capacity and in furtherance of the misconduct alleged in this complaint, Defendant Balestriere committed fraud on the court in the Sham Action by intentionally misrepresenting Plaintiff's actions or purported role in the conspiracy alleged in the Sham Action.

351     Thus, debt arising from these claims is from fraud while acting in a fiduciary capacity. Accordingly, the debt should not be discharged pursuant to 11 U.S.C. § 523(a)(4).

**WHEREFORE**, Plaintiffs Yifat V. Schnur and Yifat V. Schnur, Esq., LLC respectfully requests that the Court determine as follows:

a       On the First Cause of Action, that the debt arising from Plaintiffs' claim for defamation against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(6) as it resulted from willful and malicious injury.

83

b        On the Second Cause of Action, that the debt arising from Plaintiffs' claim for malicious prosecution against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(6) as it resulted from willful and malicious injury.

c        On the Third Cause of Action, that the debt arising from Plaintiffs' claim for violation of Judiciary Law Sec. 487 against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(6) as it resulted from willful and malicious injury.

d        On the Fourth Cause of Action, that the debt arising from Plaintiffs' claim for violation of Judiciary Law Sec. 487 after the filing of the State Lawsuit against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(6) as it resulted from willful and malicious injury.

e        On the Fifth Cause of Action, that the debt arising from Plaintiffs' claim for Slander Against Defendant Balestriere for Slander by Saland and Crotty Saland P.C., in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(6) as it resulted from willful and malicious injury.

f        On the Sixth Cause of Action, that the debt arising from Plaintiffs' claim for Defamation Against Defendant Balestriere for Defamation by Saland and Crotty Saland P.C., in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(6) as it resulted from willful and malicious injury.

g        On the Seventh Cause of Action, that the debt arising from Plaintiffs' claim for punitive damages against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $500,000,000, is nondischargeable under 11 U.S.C. § 523(a)(6) as it resulted from willful and malicious injury.

h        On the Eight Cause of Action, that the debt arising from Plaintiffs' claim for defamation against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(4) as it resulted from fraud while acting in a fiduciary capacity.

i        On the Ninth Cause of Action, that the debt arising from Plaintiffs' claim for malicious prosecution against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(4) as it resulted from fraud while acting in a fiduciary capacity.

j     On the Tenth Cause of Action, that the debt arising from Plaintiffs' claim for violation of Judiciary Law Sec. 487 against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(4) as it resulted from fraud while acting in a fiduciary capacity.

k     On the Eleventh Cause of Action, that the debt arising from Plaintiffs' claim for Slander Against Defendant Balestriere for Slander by Saland and Crotty Saland P.C., in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(4) as it resulted from fraud while acting in a fiduciary capacity.

l     On the Twelfth Cause of Action, that the debt arising from Plaintiffs' claim for Defamation Against Defendant Balestriere for Defamation by Saland and Crotty Saland P.C., in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(4) as it resulted from fraud while acting in a fiduciary capacity.

m     On the Thirteenth Cause of Action, that the debt arising from Plaintiffs' claim for punitive damages against Defendant Balestriere, in an amount to be determined at trial, but in any event not less than $50,000,000, is nondischargeable under 11 U.S.C. § 523(a)(4) as it resulted from fraud while acting in a fiduciary capacity.

n     On All Causes of Action, such other and further relief to Plaintiffs as to this Court seems just and proper.

Dated: November 18, 2024
New York, New York

**SCHLAM STONE & DOLAN LLP**


By: /s/ Jeffrey M. Eilender
Jeffrey M. Eilender
Paul Stretton
26 Broadway
New York, New York 10004
Tel.: (212) 344-5400
Fax: (212) 344-7677
E-Mail: jeilender@schlamstone.com
E-Mail: pstretton@schlamstone.com
*Attorneys for Yifat V. Schnur and*
*Yifat V. Schnur LLC*